THE STATE OF NEW JERSEY, DEFENDANT IN ERROR, v. EDWARD METALSKI, PLAINTIFF IN ERROR.

Argued March 19, 1936—Decided May 22, 1936.

For the plaintiff in error, *Walter C. Sedam.*

For the defendant in error, *Douglas M. Hicks.*

The opinion of the court was delivered by

DONGES, J. Plaintiff in error, Edward Metalski (herein-after referred to as the defendant), was tried in the Middle-sex Oyer and Terminer by a jury, upon an indictment charging him with the murder of one Warren G. Yenser, a state trooper, on November 9th, 1935. He was found guilty of murder in the first degree and sentenced to death. The judgment of conviction is before us on writ of error and also under the one hundred and thirty-sixth section of the Criminal Procedure act.

In the early morning of the date named, Yenser and Matey, state troopers, in a Ford sedan, were patrolling state highway No. 25, just west of New Brunswick. Matey was driving and Yenser was sitting to Matey's right. A coupe, with Pennsylvania license plates, was traveling eastwardly at a high rate of speed, and the troopers endeavored to overtake it. They temporarily lost trace of it, but again came up to it and pulled alongside of it and Trooper Yenser blew his whistle. The testimony was that both cars were then traveling between seventy-five and eighty miles an hour; that the coupe again shot forward; that the troopers again pulled up alongside of the coupe; and that as Yenser was about to blow his whistle again, a shot was fired, which struck Yenser in the face, causing almost immediate death.

It was undisputed that the coupe was occupied by the defendant and one Whitey Morton, who, at about two o'clock in the morning in question, had held up a tavern known as Palms Garden Cafe, on Ridge avenue, in Philadelphia, and were fleeing in a car which they had taken from a garage in Philadelphia without the knowledge of the garage attendant. After the shooting of Yenser, the defendant and Morton eluded pursuers and drove to Elizabeth, where they abandoned their automobile. Defendant was arrested in the Pennsylvania railroad station, in Elizabeth, at about seven o'clock

the same morning. Morton avoided capture and returned to Philadelphia, where, on November 11th, he committed suicide.

The coupe which was used by the defendant and Morton to escape from the scene of robbery was found to contain a sawed-off shotgun with two loaded shells, some empty shells, and two liquor bottles, partly filled. This shotgun was used by Morton in holding up the cafe, Metalski using a revolver. The hold-up apparently yielded $85 and two bottles of liquor. When captured Metalski had $40.40 in bills and change in his pocket.

The defense was that defendant was acting under coercion of Morton; that Morton demanded that defendant accompany him to Newark to see one Dorothy Johnson; that Morton endeavored to borrow money to cover the trip; that, failing in such efforts, Morton engineered the cafe robbery, in which defendant participated through fear of Morton; that defendant was driving the coupe at all times; that Morton fired the fatal shot, after breaking out the rear window of the coupe; that Morton gave no intimation of his intention to shoot at anyone; and that defendant did not knowingly aid or abet in the shooting.

Defendant admitted a number of convictions in New Jersey and elsewhere for various crimes, and that, at the time of the shooting of Yenser he was a fugitive from a prison camp in North Carolina, having escaped therefrom in August, 1935; and that on December 14th, 1935, he made his escape from the Middlesex county jail whilst awaiting trial on the indictment under consideration.

Defendant writes down thirty-three assignments of error and thirty-three identical specifications of causes for reversal, so that they will be dealt with together.

The first point argued is that there was error in the cross-examination of defendant (assignments and specifications Nos. 6, 7, 8, 9, 10, 11 and 12). We are not apprised by the assignments or specifications what particular questions are deemed to be objectionable, except that in No. 8, as to where defendant met Dot Johnson, the record discloses that this question was not pressed and not answered, and No. 10 which

charges that a question propounded to defendant as to whether he had made one or two trips to New Jersey with one Karens was error. The defendant's denial was not impeached. We think there was no harm done to the defendant, in any event.

The other assignments challenge the propriety of permitting defendant to be cross-examined touching former convictions. The argument appears to be that, when defendant in his direct examination testified to the former convictions, the state was precluded from examining him upon such convictions. The rule is well settled to the contrary. Section 1, Evidence act. *Comp. Stat., p.* 2217; *State* v. *Rusnak,* 108 *N. J. L.* 84. There was no error in this regard.

Point 2 (assignments 14 and 15) seeks to raise a question as to the propriety of questioning the common law wife of Morton as to his ability to drive an automobile. No appropriate assignment or specification is filed, but, on the merits, we see no injury by the examination.

Point 3 (assignments 16, 17 and 18) is directed to the examination of Captain Jones, produced by the state as a ballistics expert. We are not advised by the assignments or specifications what questions are deemed improper or harmful, but it is argued that it was error to permit the witness to testify that, in his opinion, a bullet taken from the radiator of the police car bore the same marks as those on a test bullet fired by the witness from a revolver found on defendant after his recapture following his escape from Middlesex county jail. We find no error in the respects complained of. Nor do we find error in the answer of the same witness to a question propounded by defendant's counsel as to how he thought defendant came into possession of the revolver that the witness believed was used on the night of the killing, that "he [defendant] knew where he left it, and went back and got it, possibly, after he got out." The answer was responsive to the question. No motion was made to strike it out, nor was any objection thereto made upon any ground. We see no error in this point.

Point 4 (assignment No. 20) deals with what the court said in his charge with respect to what deliberation was neces-

sary to make a killing murder in the first degree. The language referred to seems to be unobjectionable. The complaint is that the court apparently applied the definition to the defendant, who asserted he did not fire the shot. However, what the court said was that "whoever did kill this man" would be guilty of murder in the first degree, if it was done purposely, deliberately and with premeditation. He elsewhere left it to the jury to say who fired the shot and whether under the circumstances found, and under the law, the defendant if he did not fire it, would be guilty of murder. We see no merit in this point.

Point 5 (assignment No. 21) complains of a portion of the charge which recited some of the testimony as to how the shot was fired from the coupe and the testimony of the defendant as to the same matter, and left it to the jury to say whether the circumstances so testified to showed that the shot was fired with such deliberation and premeditation as to bring it within the statutory definition of murder of the first degree. From the argument submitted it is difficult to understand what harm it is claimed resulted or in what respect it is claimed the language of the court was inaccurate. We find no error therein.

Assignment No. 22, argued under point 6, complains of that portion of the charge wherein the court said:

"Therefore, if you find the defendant was the one who did the killing under either one or the other of the conditions I have stated, that is, either premeditated or in perpetration of a robbery, then he is guilty of murder in the first degree. But the state advances still another proposition, which is very important in the case, and which, of course, you will be called upon to consider."

The respect in which this is alleged to be erroneous is stated in the defendant's brief as follows:

"The state had the duty to prove, beyond a reasonable doubt, not only an intent to take life, but that the killing was both deliberate and premeditated, in order to convict of murder in the first degree. Therefore, the use of the word 'premeditated,' standing alone in the above connection, was judicial error."

The defendant attempts to separate this statement from the rest of the charge and to construe it without regard to the context in which it appears, but the entire charge must be read to determine whether there is any error prejudicial to the defendant. *State* v. *Banusik*, 84 *N. J. L.* 640. At this point the court was obviously referring to a premeditated killing as he had elsewhere defined it in his charge. The court instructed the jury:

"In order to constitute murder in the first degree, and to justify a conviction of that crime, it must appear by evidence, beyond a reasonable doubt, not only that there was an unlawful killing, but that the defendant intended to take the life of the deceased, and that the intention was carried into execution willfully, deliberately and with premeditation."

The court then went on to define "willfully," "deliberately" and "premeditation." These two portions of the charge may be read together, are not contradictory, and do not, therefore, fall within the rule of the cases condemning contradictory instructions which might confuse the jury. We conclude there was no harmful error in this portion of the charge in the respect complained of.

Point 7 (assignment No. 23) is directed to the following statement in the court's charge:

"Suppose you should find that while such a killing had been committed, as I have stated and outlined to you, it was committed not by the defendant but by his companion, Morton, then you must find upon the third condition submitted by the state, namely, did the defendant aid and abet the one who did commit the crime so as to make him as guilty as the one who did actually do the shooting."

The court then went on to accurately state the rule of law to render defendant guilty as an aider and abettor. We find no error in this. *State* v. *Orraye*, 84 *N. J. L.* 556; *State* v. *Giberson*, 99 *Id.* 85 (at *p.* 89).

Point 8 (assignment No. 25) likewise raises the propriety of the court's charge in the following language:

"The court charges you to consider whether a killing such as this has been shown by the evidence to be, could have been

other than a fully conceived and a willful and deliberate and premeditated attempt to take the life of the trooper, and so prevent the capture of this defendant and his companion by the troopers."

In the argument submitted one of the most thoroughly established rules in our jurisprudence is ignored. In *State* v. *Overton*, 85 *N. J. L.* 287, it was said: "It is always the right and often the duty of a trial judge to comment on the evidence, and give the jury his impressions of its weight and value, and such comment is not assignable for error so long as the ultimate decision on disputed facts is plainly left to the jury." *State* v. *Hauptmann*, 115 *N. J. L.* 412. In addition, the trial judge charged as follows:

"The court has recited some of the facts in the case, but you must distinctly understand that the court has done that only to help you in the consideration of your verdict, because you are the sole judges of the facts, the court being here to advise you only upon questions of law. If your memory of the facts, your version of the facts, or your interpretation of the facts differs in anywise from that of the court's, you are to take your memory and your version and your interpretation of the facts and not the court's, as well as any inferences which may be drawn from any unlawful facts which have been introduced into evidence.

"You are to draw from those facts which you find to be proved such reasonable and lawful inferences as you think those facts will bear. You are to take into consideration the testimony that has been given by the witnesses, and give to their testimony such credit as you think their testimony will bear. You are the judges of how far you can credit the testimony of any witness in the case. You have seen them on the stand. You have observed their demeanor. You will consider all the testimony in the case, and then at the end make up your minds as to how much credit you can give to the testimony of the various witnesses who have testified before you."

This point is without substance.

Point 9 (assignment No. 27) raises the propriety of the court's statement following his adoption of defendant's fourth request to charge, which request was in the following language:

"4. Before a jury would be legally entitled to convict this defendant, or any other defendant, of murder in the first degree, it is incumbent upon the state to prove intent, upon the part of the defendant, to take human life, and the state must prove that the act was done willfully, deliberately, and with premeditation, although it is not necessary that the premeditation shall have continued for any special length of time."

Following which the court added:

"I add to that, but the intent is for the jury to determine from the facts in the case. Of course, a man cannot deliberately point his revolver at another and shoot him down, and then say 'I didn't intend to do it.' It is for you, under the circumstances of the case, to say whether or not there was an intent by the defendant in this case to commit the crime charged."

The complaint is that the last words used in this excerpt, related only to the defendant, but, so did the request to charge, and it was apparent that the language used was in connection with the request. There was nothing harmful to defendant therein.

Point 10 (assignment No. 28) relates to the charge of the court with respect to what he said following refusal to charge defendant's eleventh request. The request was in the following form:

"If the jurors, or any of them, believe that the testimony here introduced by the state does not prove beyond a reasonable doubt that Edward Metalski fired the shot or shots which resulted in the death of the deceased; and further, if the jury believes the statement of Metalski that he was driving the coupe at a fast speed, and that he did not know of Morton's plan or intent to fire at their pursuers, then you would be justified in returning a verdict of not guilty as to the defendant."

Defendant's brief then says: "The court, after reading the above request to the jury, stated:

" 'I cannot charge you that under the circumstances of this case except to say that it was the duty of the defendant if he found out that his companion was engaged in an unlawful act to repudiate the act as quickly as possible. That is quoting to you, members of the jury, from one of the decisions of our courts, if one would escape the penalty for a crime committed by his companion, he must cease to act in complicity as soon as he had knowledge of the criminal character of the conduct of his companion.' "

The brief then asserts:

"The trial court erred in failing to qualify his additional charge to the jury on this point, by referring to the defendant's testimony that he was afraid of Morton and was present through fear of and compulsion on the part of Morton.

"It is therefore urged that, in the absence of evidence of deliberation on the part of Metalski, which it is claimed is totally lacking in this case, there could not properly be a verdict of murder in the first degree."

The court had, theretofore, charged the jury fully and accurately the law on the subject of aiding and abetting and had also dealt with the insistence of defendant that he was driving the car and that he had no knowledge of Morton's intention to fire a shot at anyone. In the circumstances presented, we see no error in this point.

Point 11 (assignment 33) is that the verdict is against the weight of the evidence. Our examination of the evidence persuades us that, on the contrary, it is amply supported by the proofs.

The state and the defense throughout the trial were in agreement that the defendant might be convicted of murder in the first degree on any of three propositions: (1) that the defendant willfully, deliberately and with premeditation fired the shot that killed Yenser; (2) that defendant and Morton were fleeing from the scene of a robbery and that, as a matter of fact, they were still engaged in the robbery and were endeavoring to avoid apprehension therefore; (3)

that, if the shot were fired by Morton, the defendant aided and abetted in such manner as to constitute him a principal, within the language of the statute. The issues of fact raised by these propositions were developed by the testimony on both sides, and were by consent submitted to the jury for its determination.

The defendant admitted that Yenser was killed by a shot fired from the automobile occupied by Morton and himself; that they were driving at a high rate of speed across New Jersey, immediately following a hold-up in Philadelphia, in which both admittedly had participated; that they had some, if not all, of the spoils of that holdup. Metalski insisted that he was driving the car, because Morton did not drive, which was denied by Morton's common law wife; and that Morton fired the shot that caused Yenser's death. If the most favorable view of defendant's testimony is taken, it is that Metalski, with Morton, was endeavoring to avoid being stopped and perhaps taken into custody, either for the latest crime, from the scene of which they were fleeing, or as an escaped convict. The proofs were susceptible of the conclusion that, if Morton fired the shot, Metalski was aware of his purpose and did nothing to stop it or disavow it.

There is testimony that Morton was driving the car and that Metalski fired the shot. It is argued that the identification of Morton as the driver by Matey is weak, and that the identification by Officer Malsam, at Linden, of Metalski as being seated on the driver's right hand, because when the coupe was stopped by a traffic light, Metalski lighted a cigarette, and Malsam plainly saw his face in the light of the match, is also weak. It appears, however, that Malsam was able to pick Metalski out of a group of eight. The weight to be given to this testimony, as against the uncorroborated testimony of the defendant, was for the jury, and the question now being, whether in the language of the statute (*Pamph. L.* 1921, *p.* 951) the verdict was against the weight of the evidence, we cannot say, upon consideration of all of the evidence, that the verdict was the result of mistake, passion, prejudice or partiality. *State* v. *Karpowitz,* 98 *N. J. L.* 546;

*State* v. *Mosley,* 102 *Id.* 94; *State* v. *von DerLinden,* 105 *Id.* 618; *State* v. *Treficanto,* 106 *Id.* 344. We consider that the weight of evidence was with the state.

The judgment under review must therefore be affirmed.

HEHER, J. (Dissenting.) There was basic error in the instruction that, on the evidence presented, the jury were at liberty to find that the killing occurred in the perpetration of the robbery, and was therefore murder in the first degree.

The underlying crime was not committed in this jurisdiction. The place of the robbery was in the city of Philadelphia, in the State of Pennsylvania; and the shooting occurred in the vicinity of the city of New Brunswick, in this state, at least sixty miles from Philadelphia. Plaintiff in error and his accomplice had then ceased to be engaged in the commission of the robbery; that crime had been completed. They had long since departed, unpursued, from the scene of the robbery; and it is evident that, viewing the testimony in the aspect most favorable to the state, the killing occurred in an attempt to escape the consequences of the earlier completed crime in another jurisdiction. On that theory, the jury could have found a deliberate and premeditated design to kill in order to effect escape, but not a killing in the "perpetration" of a robbery, within the intendment of section 107 of the Crimes act, as amended by chapter 238 of the laws of 1917 (2 *Comp. Stat.* 1910, *p.* 1780; *Pamph. L.* 1917, *p.* 801; *Cum. Supp. Comp. Stat.* 1924, § 52-107), classifying as murder of the first degree a killing in "perpetrating or attempting to perpetrate" a robbery, even though there be no deliberate and premeditated purpose to kill.

The shooting was not, in such circumstances, a part of the *res gestæ* of the robbery. We are not advised as to the constituent elements of robbery under the laws of Pennsylvania. At the common law, robbery was, and under our statute still is, the felonious and forcible taking from the person of another of goods or money of any value, by violence or putting him in fear. 4 *Bl. Com.* 242; 2 *Comp. Stat.* 1910, *p.* 1785. It is implicit in the doctrine of *res gestæ* that the

thing falling into that category must be immediately connected with the main fact or event. The term comprehends acts so closely connected with the principal fact as to constitute a part of the transaction itself. It is defined "as those circumstances which are the undesigned incidents of a particular litigated act, which are admissible when illustrative of such act." And it has been said by Chief Justice Beasley that "their sole distinguishing feature is that they should be the necessary incidents of the litigated act; necessary, in this sense, that they are part of the immediate preparations for, or emanations of such acts, and *are not produced by the calculated policy of the actors.*" *State* v. *Hunter,* 40 *N. J. L.* 495, 538. See, also, *State* v. *Doro,* 103 *Id.* 88; *State* v. *Kane,* 77 *Id.* 244; *Donnelly* v. *State,* 26 *Id.* 601. The shooting here is not so classable. It was not an act immediately connected or identified with the perpetration of the basic crime. Compare *State* v. *Mule,* 114 *Id.* 384; 177 *Atl. Rep.* 125; *State* v. *Turco,* 99 *N. J. L.* 96; *State* v. *Rombolo,* 91 *Id.* 560; *State* v. *Carlino,* 98 *Id.* 48; *State* v. *Gimbel,* 107 *Id.* 235; *State* v. *Hunter, supra; People* v. *Smith,* 232 *N. Y.* 239; 133 *N. E. Rep.* 574; *People* v. *Marwig,* 227 *N. Y.* 382; 125 *N. E. Rep.* 535; 22 *A. L. R.* 845; *People* v. *Marendi,* 213 *N. Y.* 600; 107 *N. E. Rep.* 1058; *People* v. *Giro,* 197 *N. Y.* 152; 90 *N. E. Rep.* 432; *Conrad* v. *State,* 75 *Ohio St.* 52; 78 *N. E. Rep.* 957; 6 *L. R. A.* (*N. S.*) 1154; *Bissot* v. *State,* 53 *Ind.* 408.

Ordinarily, the accused's prior departure from the premises, for the purpose of effecting escape, has been regarded as decisively indicating the completion of the underlying crime, or desistance therefrom. *People* v. *Huter,* 184 *N. Y.* 237; 77 *N. E. Rep.* 6; *People* v. *Smith, supra; People* v. *Marwig, supra.* Here, the police officers were unaware of the commission of the robbery; they were moved to action by the unlawful speed of the automobile. The state proved (the evidence was uncontroverted) that the robbery was committed at two A. M.; that at four A. M., or shortly thereafter, plaintiff in error and his accomplice, apparently under the influence of intoxicating liquor, entered a roadside diner near Plains-

boro, where they remained for a half hour or more, the while eating, drinking and conversing with the patrons; that they re-entered the automobile, and, after proceeding several miles in the direction of Newark (their destination was the home of accused's mother in that city), were hailed by the police officers. The fact that they then had possession of the money stolen is not, in the circumstances, material; the fatal resistance was designed to escape apprehension and punishment for the completed crime, not to consummate an uncompleted crime of the statutory class. As well might it be said that, if plaintiff in error and his accomplice had continued the journey, and, two or three days or a week or a month later, while in possession of the loot, or a part thereof, killed to escape arrest for the original robbery, the homicide occurred in the perpetration of the latter crime. In *People* v. *Marwig, supra,* Judge Crane, speaking for the New York Court of Appeals, said: "It is evident that, if the criminals *had escaped* and were a mile away from the place of the crime, it could not be said that they were then in the commission of a felony." And in *State* v. *Hauptmann,* 115 *N. J. L.* 412 (at *p.* 428), Mr. Justice Parker, in applying the apposite principal, said: "We think that the jury were clearly entitled to find that the child was killed while the 'burglar' was *still on the Lindbergh premises;* and, if so, the homicide would be murder in the first degree under sections 106 and 107" of the Crimes act, *supra.*

In *State* v. *Turco, supra,* the accused, at the time of the killing, was in the act of removing the feloniously coveted silk and the motor truck containing it from the *situs* of the robbery. He was "still engaged in the robbery;" the homicide was not, in the circumstances, "an independent act dissociated from the robbery." And in *State* v. *Carlino, supra,* Mr. Justice Swayze, in reviewing the conviction of one of Turco's accomplices, who had forcibly taken the truck driver and his helpers some distance back from the highway, and was not present when the deceased was killed by Turco, said: "It seems clear to us that as long as the four men remained in charge of the chauffeur of the truck and his companions

as prisoners, just off the highway on which the robbery was committed and within a very short distance of the point where the shots were fired, and as long as the truck and the silk seized by the robbers remained in their control at the scene of the robbery and homicide with the evident intent on their part to return to Pennsylvania—the state from which they came—we think the robbery was not at an end. The robbers themselves must have contemplated further joint action until they had made their escape; holding the chauffeur and his companion as prisoners in bonds was itself an act in pursuance of the concert of action to commit the robbery. The holding of the two men as prisoners was a continuous act, and it would be preposterous to attempt to say at what instant of time, short of their release or escape, the responsibility of the. robbers ceased." In *State* v. *Gimbel, supra,* the accused, while in the immediate vicinity of the store premises where the robbery occurred, with the store manager and other persons, including the deceased, in close pursuit, "ran [with the stolen goods in his possession] through several streets and lots" to a standing automobile, with the intention of using it to effect his escape. Finding the deceased and the store manager at his heels, he fired two shots at them, one of which inflicted the fatal wound.

The fundamental differences betwen these cases and the one under consideration are obvious; the fatal act here was not a part of the *res gestæ* in any sense of that phrase as it has been defined in this state. Our definition of the term carries the doctrine to its extreme limit. Whatever may be its normal limits, it cannot be extended to give an interpretation to this statute that is at variance with its plain terms. This doctrine has been carried to illogical extremes, and has been the subject of much adverse criticism. Professor Wigmore says that the phrase has been "so convenient a term for judicial conjuring that it is even found applied to matters outside the domain of the rules of evidence proper, whether or not the facts involve the utterance of words," and "ought therefore wholly to be repudiated, as a vicious element in our legal phraseology." *Wigm. Ev.* (*2d ed.*), §§ 1767, 1769.

Further observations by this contemporary authority, which need not be set out here, serve to point the danger of unsound extensions of the principle.

Section 107 of the Crimes act, *supra,* is, on well settled principles, to be strictly construed. We are not at liberty to enlarge upon statutory definitions of crime. Technical words are to be given their technical sense. The legislature has not seen fit to classify as murder in the first degree a killing done in resisting arrest after the completion of a robbery, unless the act be characterized by the statutory requisites of deliberation and premeditation, without which it would be homicide of the second degree. *Brown* v. *State,* 62 *N. J. L.* 666; *Bullock* v. *State,* 65 *Id.* 557; *State* v. *Bertchey,* 77 *Id.* 640; *State* v. *Clayton,* 83 *Id.* 673.

Now, my brethren of the majority do not express a contrary view. Although two passages of the charge embodying the erroneous instructions have been assigned for error, and specified as causes for reversal under section 136 of the Criminal Procedure act (*Comp. Stat.* 1910, *p.* 1863), and, by a subjoined specification, the question was unequivocally raised by the thirtieth assignment of error and the cause for reversal bearing the like number, this particular error seems not to have been argued orally or on the brief; and, laying hold of this, the majority say that "the state and the defense throughout the trial were in agreement that the defendant might be convicted of murder in the first degree on any of three propositions," one of which was that "defendant and Morton [the accomplice] were fleeing from the scene of a robbery and that, as a matter of fact, they were still engaged in the robbery and were endeavoring to avoid apprehension therefor;" and that "the issues of fact raised by these propositions were developed by the testimony on both sides, and were by consent submitted to the jury for its determination."

Without conceding that there was assent in fact, it is fundamental in our jurisprudence that plaintiff in error could not, by consent or acquiescence in any form, subject himself to the drastic consequences of a conviction of murder in the first degree, if the homicide lacked the essential elements of that

grade. *State* v. *O'Leary,* 110 *N. J. L.* 36; *State* v. *Brown,* 111 *Id.* 595. It was not his province nor that of his counsel to consent to his trial upon the fundamentally mistaken theory, propounded by the state and adopted by the trial judge, that, at the time of the shooting, the accused and his accomplice were still engaged in the commission of the Pennsylvania robbery, and that the killing was therefore murder of the first degree, within the intendment of our statute, even though utterly lacking in deliberation and premeditation. As this court said in *State* v. *O'Leary, supra,* borrowing the language of Mr. Justice Harlan, speaking for the federal Supreme Court in *Hopt* v. *Utah,* 110 *U. S.* 574 (at *p.* 579); 4 *S. Ct.* 202; 28 *L. Ed.* 262: "The natural life, says Blackstone, 'cannot legally be disposed of or destroyed by any individual, neither by the person himself, nor by any other of his fellow creatures, merely upon their own authority.' 1 *Bl. Com.* 133. The public has an interest in his life and liberty. Neither can be lawfully taken except in the mode prescribed by law. That which the law makes essential in proceedings involving the deprivation of life or liberty cannot be dispensed with or affected by the consent of the accused, much less by his mere failure, when on trial and in custody, to object to unauthorized methods."

Basic safeguards devised by the law to protect against unjust and unfounded accusation are not alone for the just and the righteous. The accused, no matter how grave the offense, or the degree of his depravity, comes into court under a presumption of innocence; and the burden rests upon the state to establish his guilt of the offense charged—one known to the law—beyond all reasonable doubt, with a due regard for all the essential rights that are his. This is none the less the state's obligation when the accused is one who has pursued a lawless career. The peremptory duty is ever present to guard against evil repute or anti-social conduct becoming a substitute for proof of a crime sufficient in the law. This was not mere "trial error," as the term was used by Mr. Justice Parker in *State* v. *Hauptmann, supra,* but an error so funda-

mental and radical as to render the judgment nugatory. Compare *State* v. *O'Leary, supra; State* v. *Brown,* 111 *N. J. L.* 595; *Hopt* v. *Utah, supra.*

It is elementary that a conviction erroneously secured on one theory (and we are constrained to assume that the jury found that the killing occurred in the perpetration of the robbery, and rejected the other theories) may not be sustained "on the conjecture that it would have followed just the same if the correct theory had been applied." See *People* v. *Moran,* 246 *N. Y.* 100; 158 *N. E. Rep.* 35; *People* v. *Smith, supra.*

More need not be said, it seems to me, to demonstrate that the ends of justice demand that there be a new trial of the issue free of this fundamental vice; and I shall therefore vote to reverse.

Mr. Chief Justice Brogan, Mr. Justice Perskie and Judge Rafferty have requested me to express their concurrence in these conclusions.

*For affirmance*—THE CHANCELLOR, LLOYD, CASE, BODINE, DONGES, HETFIELD, DEAR, WELLS, WOLFSKEIL, JJ. 9.

*For reversal*—THE CHIEF JUSTICE, HEHER, PERSKIE, RAFFERTY, JJ. 4.