STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v. JOHN HENRY TUNE, DEFENDANT-APPELLANT.

Argued November 22, 1954—Decided December 20, 1954.

101

Mr. *Charles Danzig* argued the cause for the appellant (*Mr. Edward J. Gilhooly*, attorney).

Mr. *Charles V. Webb, Jr.*, Prosecutor of the Pleas, argued the cause for the respondent (*Mr. James R. Giuliano*, Assist-

ant Prosecutor of the Pleas; *Mr. C. William Caruso*, Special Assistant Prosecutor, on the brief).

The opinion of the court was delivered by

OLIPHANT, J. Defendant-appellant was tried and convicted on March 4, 1954, before Judge Speakman and a jury in the Essex County Court, of murder in the first degree without recommendation for life imprisonment. The mandatory death sentence was imposed.

The indictment was in the usual short form, charging, in substance, that on the 22nd day of August, 1952, the defendant did "wilfully, feloniously and of his malice aforethought, kill and murder William Prather," etc. *Cf. R. S.* 2:188–11, *R. R.* 3:4–3; *State v. Bunk*, 4 *N. J.* 461, 467 (1950), *certiorari* denied 340 *U. S.* 839, 71 *S. Ct.* 25, 95 *L. Ed.* 615.

The theory of the prosecution was that the murder was committed in the perpetration or in the attempted perpetration of sodomy or robbery or both. *N. J. S.* 2A:113–1. Its case was predicated primarily upon the confession of the defendant supported by other incriminating evidence produced against him. *State v. James*, 96 *N. J. L.* 132, 147 (*E. & A.* 1921) ; *State v. Cole*, 136 *N. J. L.* 606, 610 (*E. & A.* 1947).

The story of the murder and the events leading up to it from the mouth of the defendant, as set forth in his confession, was that he met the deceased on the afternoon of August 22, 1952 at a tavern in Newark and had two drinks with him. He was short of money and decided he was going to steal some from "Bill." Deceased's automobile was parked in front of the tavern. While they were drinking they were joined by a girl by the name of Naomi Boyd. Defendant asked the deceased for his car keys "so I could get into his car and drive him somewhere where I could get his money." But on hearing the request Naomi Boyd took the keys of the deceased away from him.

On leaving the tavern deceased asked the defendant to come with him and they, together with the Boyd woman, got in the car. She left the car in the vicinity of her home on

Morris Avenue, Newark. The defendant still had robbery in his mind for he said, "I still wanted to get Bill's money from him so I decided that if I got him a girl that he would go to bed with his clothes off, and I could get his money out of his clothes." Though he tried he was unsuccessful in procuring a girl. He went to the apartment of a friend to retrieve a radio he had previously loaned to her, and on returning to the car found deceased asleep. He made him move over and then drove the car himself. He sideswiped several cars after which the deceased awoke and resumed the driving and they proceeded to the home of the deceased in Irvington.

They went up an alleyway and down into the cellar of the house into a small room with a sofa in it. The defendant understood while driving to the house that the deceased wanted to have unnatural relations with him and "I went along because I was interested in getting the money away from him."

We will omit the sordid details but defendant described the act of sodomy which he committed. While committing it he took Prather's belt and put it around his neck to choke him. He said, "When I started to choke him I didn't intend to kill him. I merely intended to make him unconscious so that I could steal his money. I kept twisting the belt until he became limp. Then I let go." Defendant then went through Prather's clothes. He took a wallet and two sets of keys, and still in search of money he ransacked through two duffle bags which were in the room.

After leaving the cellar the defendant went to the front entrance of Prather's house, rang the bell, and when Mrs. Prather answered he endeavored to obtain $20 from her on the pretext that her husband had been in an accident and needed it. This occurrence was corroborated by Mrs. Prather at the trial and she identified the defendant as the individual who endeavored to get the money from her. One John Thomas Dixon, who occupied a portion of the Prather apartment, likewise recounted this occurrence and identified the

defendant as the man who had had the conversation with Mrs. Prather.

The body of the deceased was found the following day in the cellar room by his wife, who called the police. The wallet containing deceased's social security card which defendant took from Prather was torn up and thrown away by him, as was a set of keys he had taken. The pieces of the wallet were found and received in evidence.

Defendant in his confession said that the day following the murder he told his wife he had "croaked a man." He also said he spoke to a "Phyllis" who lived in his apartment and that he had told her the same thing. At the trial Phyllis McNair, the person just referred to, testified that defendant had said to her he believed "he had killed a man last night," that he "was down in the basement and that he believed he had killed a man with his belt, that he had on the man's belt." A William B. Stargell, with whom the defendant worked, likewise testified that on the morning of August 23 the defendant said to him, "I believe I killed a man last night."

On being called to the scene of the crime police officers found a leather belt in the murder room and on it being shown to the defendant he stated, "my belt, the one I choked Bill with is a leather belt, snakeskin in color." He explained to the police officers how in the darkness he had reached for his own belt but got Bill's instead.

The assistant medical examiner testified that Prather's death was due to strangulation, and the autopsy revealed that the lacerations "were compatible with the lesions that you could expect in sodomy."

The defendant was arrested about 4:00 P. M. on August 23 and taken to police headquarters. He was asked about the events of the previous evening and yelled "All right, all right; I killed a —— —— last night and would do it again." At 8:30 that night he was taken to the scene of the crime where he re-enacted it. He was then taken to the Irvington Police Headquarters where he was served some

food and at 12:20 A. M. began to make his confession. The next afternoon he was interviewed by an impartial citizen-witness, Mr. William T. Hope, who asked defendant "if he made those statements of his own volition, and he said that he did," and on being asked "if he had been bounced around" the defendant "just grunted and he said no." Mr. Hope testified that the defendant read his statement "aloud" and that it took him three-quarters of an hour to read it.

The defense was a general and specific denial that he had killed Prather or that he had committed or attempted to commit sodomy or robbery. He testified that he had done a lot of drinking on the day of the murder, that the deceased, he and another man he did not know went to the cellar of Prather's house; that this "fellow" and the deceased went into another room and he went to sleep, he did not know for how long, and that when he awoke he left the place. He said this was the story he had told the police.

He made a categorical denial of all incriminating statements contained in his written statement; he denied he had made any statements concerning the commission of the killing, or of any attempted sodomy or robbery of the deceased; and he stated he signed the confession only after threats were made by the police that his wife, who was then pregnant, would be beaten and locked up. On cross-examination, when asked to explain the presence of the deceased's belt on him, he stated "I can't explain how it got on," and when asked about his own belt being missing, he said he didn't notice anyone removing his belt while he was asleep.

The appellant raises seven points as to why the verdict should be set aside: (1) the trial court's refusal to allow inspection by the defense before trial of the defendant's confession; (2) the refusal of the trial court of the right to cross-examine a witness as to her former conviction of crime; (3) the impregnation of the jury with the thought that the defense was unfair; (4) the impropriety of the cross-examination of defendant's wife and the admission of incompetent prejudicial testimony; (5) unfairness in the

procedure in determining the voluntariness of the confession and its admissibility into evidence; (6) errors in the charge of the court and its refusal to charge certain requests submitted by the defendant; and (7) error with respect to the testimony of the witness Stargell.

It is significant that no claim is made that the verdict was against the weight of the evidence and in our judgment no such claim could successfully be made.

We will deal with the several points in the order briefed and argued.

I

The right to examine and inspect a confession was recently determined by this court when that phase of this very case was previously before us, *State v. Tune*, 13 *N. J.* 203 (1953), and defendant's chief complaint now seems to be against the rule adopted by us then.

At that time the trial court had granted the defendant the right to inspect his confession, which order, on appeal of the State, we reversed. There the affidavit in support of the motion was made by defendant's counsel in which it was said that the defendant could tell counsel nothing of its contents. When a subsequent motion for inspection was made in the instant case it was supported by an affidavit of the defendant relating to the circumstances under which the confession was obtained and in which he denied any unnatural relations with Prather. Further, an affidavit of defense counsel stated that they had learned that sodomy was involved in the crime, that the defendant had denied to them any act of sodomy, that such an act involved the "existence of abnormal personality characteristics" which required the aid of a psychologist or psychiatrist, and without an inspection of the confession to determine the necessity of calling upon a psychologist or a psychiatrist to examine the defendant and to determine the necessity for his expert testimony the defendant would be denied a fair trial.

At the argument of this motion the defense was apprized categorically of the fact "that the evidence clearly indicated that there was sodomy connected with the case." Certainly the defendant knew whether there was or was not and the trial court authorized defense counsel to retain a psychiatrist, at state expense, to examine the defendant before trial. True, the defendant denied to the psychiatrist that he had committed or attempted to commit sodomy, but when the confession was admitted in evidence at the trial there was no motion for a recess to allow the psychiatrist to confront the defendant with that confession and again examine him.

██ We held in our prior decision in this case that a defendant has no absolute right to an inspection of his confession prior to trial and that an application for such an inspection is addressed to the court's sound judicial discretion, citing *State v. Cicenia*, 6 *N. J.* 296 (1951). We adhere to that rule and in the instant case can find no abuse of discretion, nor that any such abuse had led to "unfairness" at the trial which deprived the defense of the use of psychiatric opinion regarding the defendant's state of mind at the time of the commission of the crime.

The defense interposed at the trial that the defendant's senses were befuddled, that his faculties were made prostrate by intoxication so that he was incapable of forming or entertaining an intention to kill. There was never any such defense interposed such as is now sought to be made use of. The confession itself was complete in details and together with the re-enactment of the crime lent little or no support to the defendant's claim of intoxication.

## II

The defendant argues that he was improperly limited in his cross-examination of the State's witness Naomi Boyd. She was asked whether she had ever been convicted of a crime. Her answer was "Yes." Then upon being asked "What was the crime for which you were convicted?" her

answer was, "Only in the Family Court once or twice" and "once for fighting." The assistant prosecutor then objected to further examination unless the defense was prepared to show conviction of a crime. Following a colloquy between the court and counsel the court struck the answers on the ground that there was no evidence that she had been convicted of a crime, since a conviction in the family court and for fighting was not evidence of any conviction of a crime as distinguished from other lesser offenses. Defense counsel admitted he had no information nor any record as to the witness having been convicted of crime. The State offered its aid to defense counsel in procuring the record of any conviction of the witness of a crime, if there was any such, and stated that if any record so showed he would stipulate it for the record. Before the close of her cross-examination the State advised the court that the records of the prosecutor's office, the family court and the Newark Police Department had been searched and the only record found was that the witness had been charged in police court with fighting and fined $10; that it could not be determined whether the charge was made under an ordinance or the criminal statute. Defense counsel then stated "We will have that checked." The matter was not pursued further by the defense.

Just what the defendant or the police court meant by "fighting" is not clear. It could have been some minor offense or simple assault or fighting as defined by R. S. 2:110–4 which is now cognizable under the Disorderly Persons Act, N. J. S. 2A:170–27.

The statute N. J. S. 2A:81–12, formerly R. S. 2:97–13, provides that the conviction of any crime by a witness may be shown for the purpose of affecting his credibility either by examination or the production of the record thereof.

 "Any conviction of crime which has been had against the witness may be shown upon his cross-examination; and every question which calls for the disclosure of such a conviction is competent, notwithstanding that it fails to specify the nature of the crime, the time or place of its commission, or the court in which the conviction was had." *State v. Fox*, 70 *N. J. L.* 353 (*Sup. Ct.* 1904).

■ It is not necessary that the cross-examiner have in his possession the record of a prior conviction or knowledge thereof, but without such record or *bona fide* reason to believe to the contrary if the answer of the witness to the general question is "No" counsel is bound thereby. If the answer is "Yes," counsel may examine further to show anything that a record thereof might disclose, *State v. Rusnak*, 108 *N. J. L.* 84 (*E. & A.* 1931); *State v. Metalski*, 116 *N. J. L.* 543 (*E. & A.* 1936); *State v. Taylor*, 5 *N. J.* 474 (1950); *State v. Nagy*, 27 *N. J. Super.* 1 (*App. Div.* 1953).

■ The defense having no record or knowledge of a previous conviction of the witness Boyd, and her answers indicating that she had not been convicted of a crime, it was properly prevented from creating in the minds of the jury a false premise that she had been so convicted and we find no error. *State v. Cooper*, 10 *N. J.* 532 (1952).

### III

There can be no question but what the assistant prosecutor was aggressive, vigorous and zealous in his trial of the cause, as he should have been, but we do not agree with the defendant's contention that in this mode of trial there was created in the minds of the jury the impression that the State was fair in the presentation of its evidence and the defense unfair so that the defendant was thereby prejudiced and deprived of a fair trial. The prosecutor, on several occasions, characterized the tactics of the defense as "unfair" and stressed the fact that he was being "fair," and the defendant sums up its argument by stating, "We submit that the characterization, insinuations and innuendoes of the prosecution were so frequent and persistent that the jury was confused, misled and inflamed and that the defendant was deprived of a fair trial."

■ There is nothing in the record which justifies any such assertion and nothing showing the prosecutor's conduct deserving the criticism as tending to becloud the issues and

prejudice the accused. A careful perusal of the record, and it is lengthy, reveals that the complained of occurrences were infrequent and that on but one occasion did the defendant take an exception to the charge of "unfairness." No specific objection was made to the court concerning the instances complained of.

The trial was conducted by Judge Speakman with decorum and dignity and he was in full control of the proceedings at all times.

The jury was not prejudiced and we find no violation of the fundamental rights of the defendant.

## IV

The argument under this heading relates to the cross-examination of the defendant's wife and the allegation that incompetent testimony was admitted which was prejudicial to the defendant.

She appeared as a defense witness on two occasions; the first in support of defendant's claim of the involuntariness of his confession, and the second on defendant's main case. On direct examination she testified she had been at police headquarters for 10 or 15 minutes after her husband's arrest. On cross-examination she stated she had seen her husband there. She was then asked if she had talked with him and answered "No." On further cross she was shown a written statement she had given the police in order to contradict this, but the court properly refused to allow any conversation between her husband and herself to be testified to.

Later defense counsel, in re-direct examination, asked Mrs. Tune if Mrs. McNair had told her that the defendant had said to her that "he had croaked a man last night," and the witness replied "No." The prosecutor then on re-cross asked what Mrs. McNair had said and an objection was sustained. Further questioning elicited the testimony that he (Tune) had said that he believed he and some fellow had had a fight.

█ We can find no prejudicial error in the cross-examination of Mrs. Tune or in the discussion of the assistant prosecutor with the court, as argued for by the defendant, concerning the statutory disability of a married woman to testify against her husband. Defense counsel himself had opened the door to the complained-of cross-examination.

█ When the witness was asked if Mrs. McNair had talked to her about the defendant, she replied "No, sir, I don't remember." Defendant's objection to a question whether Mrs. McNair had told her of defendant's admission that "he had beaten up a man last night" was overruled and the court made the following statement to the jury:

"I will allow her to answer that. I want to say to the members of the jury now that I am permitting this, not as any proof of the fact, but only insofar as it may tend—that is for you to decide—to contradict this witness' testimony. It is only for that purpose and that purpose alone."

The cross-examination was allowable for impeachment purposes and was so limited by the court. See *State v. Donato*, 106 *N. J. L.* 397, 406 (*E. & A.* 1930).

There was no error.

## V

The argument here is nothing more than a quarrel with the law on the determination as to whether or not a confession is voluntary. The defendant makes no claim that there was error in this regard under the law as it has existed in this State for years but says that the "procedure followed, though consistent with our cases on the subject and ostensibly designed to protect a defendant from the consequences of the admission of incompetent evidence, results in such fundamental unfairness to a defendant that it has no place in a judicial system that has for its objective a fair trial."

█ The State submitted its evidence on the voluntariness of the defendant's oral statements and confession in the presence of the jury with the consent of defense

counsel. The court determined on the evidence that the confession was voluntarily made and admitted it in evidence. It instructed the jury that because the confession was admitted in evidence did not mean that the jury should take it as the truth, that they were the sole judges of the facts, and that if they found that the statement in its entirety or any part of it was not true in fact that they might reject it *in toto* or any part thereof which they found to be untrue and completely disregard it. This was consistent with the settled law that the voluntariness of a confession, its competency, is primarily a question for the trial judge. The function of the jury is to determine the truth of the facts as contained therein and the weight to be given it. *State v. Cole*, 136 *N. J. L.* 606 (*E. & A.* 1948), *certiorari* denied 334 *U. S.* 851, 68 *S. Ct.* 1503, 92 *L. Ed.* 1773; 334 *U. S.* 862, 68 *S. Ct.* 1519, 92 *L. Ed.* 1782 (1948); *State v. Vaszorich*, 13 *N. J.* 99 (1953); *State v. Walker*, 15 *N. J.* 485 (1954). There was more than sufficient evidence to support the determination of the trial court that the confession was voluntarily made. The charge of the court followed and was consistent with the rule in this State as stated in *State v. Compo*, 108 *N. J. L.* 499, 503, 504 (*E. & A.* 1932); *State v. Foulds*, 127 *N. J. L.* 336, 339 (*E. & A.* 1941); *State v. Cole, supra; State v. Bunk, supra.*

## VI

The court charged defendant's requests Nos. 28, 29, 30 and 31 on the subject of intoxication and then said:

"Now, in dealing with this contention of the defendant you should use *great caution* not to give immunity to persons who commit crime when they are inflamed by intoxicating drink; you must discriminate between the condition of mind merely excited by intoxicating drink and yet capable of forming a specific intent to commit robbery or sodomy or both, and such prostration of the faculties as to render a person incapable of forming such an intent.

I think the soundness of that observation must be apparent to you; otherwise all one would have to do to be excused of the commission

of crime would be to go out and get drunk or get high and commit the crime and say, 'I was drunk.' So that you must be careful to discriminate between the two conditions as I have referred to them." (Italics supplied)

An exception was taken thereto. The use of the words "great caution" is complained of and the argument is that the defendant was thereby burdened in establishing intoxication beyond a reasonable doubt, not by a mere preponderance of evidence. We do not so read the charge. The court merely pointed out that not all intoxication has the effect of negativing intent, but only intoxication which prostrates the mental faculties to such an extent that a specific intent cannot be formulated, and that the jury should use caution in making the distinction. The jury was specifically charged that to sustain the defense of intoxication it must be established by a preponderance of the evidence.

The case relied upon by the defendant, *State v. Mangano*, 77 *N. J. L.* 544, 550 (*E. & A.* 1909), is not in point. There the trial court charged that the defendant must, by the evidence, "create such a doubt as to his mental capacity as to *convince* you that he was unable to reason or deliberate." Such a charge approached too closely to the rule of reasonable doubt. The charge here imposed no such burden. The charge as given must be considered as a whole, it was understandingly given, it was lucid and accurate.

The next alleged error in the charge relates to that portion thereof dealing with intent and the element of force as an ingredient of the crime of robbery. After the defendant took an exception to the charge as given on this point the court clarified what had been charged and told the jury in plain language as follows:

"In one respect I will say this to you: I charged you that if you find the defendant did apply the belt or a belt to the neck of William Prather in such a manner as to choke him and cause his death, that that would constitute force sufficient to provide the element of force necessary to constitute the crime of robbery.

It is to be understood, of course, that that must be taken in connection with all my charge that he must be intended to do so, and

I did not thereby mean to imply that if he did not know that he did it that that would constitute robbery, because as I said on three different occasions, he must have the intent.

But if you find that he did have the intent and he was not so intoxicated that he was bereft of the faculty of forming such intent, and that in intending to rob he did apply the belt to the neck of William Prather, choking him and causing his death, and if you find that beyond a reasonable doubt, I should again charge that that constitutes force sufficient to apply the element of force which is absolutely necessary to find that a person committed the crime of robbery."

Thus the jury was instructed that the application by the defendant of the belt to Prather's neck and choking him to death would constitute the force necessary to the crime of robbery; that such fact should be considered together with all of the charge on the subject of intent, and that the court did not mean to imply that robbery could be committed without such intent, it being pointed out on three separate occasions in the charge that the act of choking must have been done with intent; and that if the jury found beyond a reasonable doubt that defendant did have the intent, and was not so intoxicated as to be incapable of forming such intent, the act of choking Prather to death with the belt with intent to rob provided the necessary force to commit the robbery.

This was a correct exposition of the law and there was no error.

Defendant then complains of the refusal of the trial court to charge his requests Nos. 7 and 12 relating to the presumption of innocence and the burden of proof.

Without setting forth the language of the requests and the charge on these subjects it is crystal clear that the subject matter of those requests was fully, adequately and legally covered. This is the oft-repeated situation where complaint is made by a defendant when his requests to charge are not given in the exact language as submitted. The court need not charge in the exact language of the request provided that its subject matter is fully covered, and in examining the charge for error the particular portion of the charge

complained of must be construed with the context of the entire charge. *State v. Tansimore*, 3 *N. J.* 516 (1950); *State v. Bunk, supra; State v. Grillo*, 11 *N. J.* 173 (1953).

There was no error.

■ By request to charge Nos. 21, 22 and 23 the court was asked to charge the jury that it must come to an unanimous conclusion as to whether the defendant was to suffer the death penalty and that by unanimous vote the jury must agree not to recommend life imprisonment. This is not the law. *State v. Bunk, supra.*

The defendant bluntly says, "The rule laid down by the majority in *State v. Bunk* constitutes judicial legislation. * * * and that *State v. Bunk* should be overruled." We decline to do so.

The final argument against the charge relates to the confession and the oral statements of the defendant. We have previously dealt with this, and the additional matters raised hereunder have no merit whatever. The court properly left it to the jury to accept such part of the confession which it believed and to reject such part or parts as it disbelieved.

## VII

This final asserted error relates to certain testimony of a witness, William B. Stargell, who testified that the defendant said, "I believe I killed a man last night." The witness was then asked for the exact words of the defendant's statement, which he gave. The assistant prosecutor stated to the court that he did not know whether the jury had heard the answer and the court directed the witness to repeat it. The assistant prosecutor then stated, "Some of the jurors evidently did not hear it." The court thereupon directed the witness to step down before the jury, face it and repeat what the defendant had said to him. This the witness did.

■ Defendant asserts that the repetition of the answer and the dramatic effect of having the witness come off the

stand and face the jury gave an emphasis to those words that are not consistent with a fair trial.

We perceive that the only purpose was to have the jury hear the witness' answers clearly when it was evident that the witness was not making himself heard and the jurors had difficulty in hearing him.

No objection to this procedure was made by the defendant and the matter complained of does not come within *R. R.* 1:5–1(*a*). The procedure was in the sound discretion of the court.

We observe, however, that the more orderly procedure for the court to have adopted would have been for it to direct the reporter to repeat the answer of the witness.

Finding no error in the trial of the cause the judgment of the Essex County Court is affirmed.

HEHER, J. (dissenting). I hold the view that there was error in the denial of the accused's application for a pretrial inspection of the confession attributed to him, but there is no showing of prejudice in the defense of the accusation on the merits. I am not persuaded that in the particular circumstances the ruling worked a denial of the essentials of a fair trial.

The trial judge seemingly entertained the opinion that a witness may not be interrogated as to a prior conviction of crime for the purpose of impeaching him under *N. J. S.* 2*A*:81–12 unless the cross-examiner be at the time possessed of competent proof to controvert a denial; and this I consider a fundamental misapprehension of the statutory rule of policy. In so holding, the judge informed the accused's counsel that if they desired access to the "records of any court in this county they will be obtained for you at any time," an obviously insufficient substitute for the right of cross-examination—for a conviction of crime as an instrument of testimonial impeachment has no such local limitation—and contrary to the rationale of *State v. Fox*, 70 *N. J. L.* 353 (*Sup. Ct.* 1904), which I accept as a sound view of the statute.

But here, also, it is not shown that the ruling adversely affected the defense on the merits. Certainly, this is so as to the witness Boyd; and it does not appear that by this disposition the accused was in fact precluded from impeaching any other witness in this wise.

But there was, I would suggest, reversible error in the overruling of an objection to a question directed by the county prosecutor to the accused's wife, recalled as a witness by the accused, as to an alleged incriminatory admission by the accused related to her by one Phyllis McNair.

"Q. Didn't she (McNair) tell you that John (the accused) had told her he had beaten up a man that night? A. I remember her saying something like that."

The judge, in so ruling, turned to the jury and said:

"I want to say to the members of the jury now that I am permitting this, not as any proof of the fact, but only insofar as it may tend—and that is for you to decide—to contradict this witness' testimony. It is only for that purpose and that purpose alone."

This was utter hearsay, on a crucial issue in the case, and therefore presumably harmful. I can find no rational ground for supposing that the evidence thus given worked no injury to the accused. True, on redirect examination the witness affirmed that McNair had not quoted the accused as saying "he had croaked a man last night," and an objection to further inquiry by the State as to what McNair "said if you can remember" was made and sustained; yet the objectionable testimony remained for consideration by the jury, supplemented by the witness' further testimony, later elicited by the judge, that McNair had quoted the accused as saying "he believed he and some fellow had a fight, and that was all." The risk of harm is not so remote as to be excludable from the calculations of reasonable minds. There was no justification whatever for the introduction of hearsay so vital in its probable consequences.

And I find error of substance in the qualification of the request to charge that the accused had the burden of estab-

lishing "by a preponderance of the evidence" the defense of intoxication of such degree "that his faculties were prostrated and he was rendered incapable of forming the specific intent to commit or attempt to commit robbery or sodomy," a request charged as thus submitted but under the added injunction to the jury to use "great caution" not to give "immunity to persons who commit crime when they are inflamed by intoxicating drink."

This qualification of the instruction as tendered and charged would reasonably suggest to the lay mind a burden greater than mere preponderance; certainly, the judge was not content to instruct in the terms of the long-established rule, but had in view a measurable restraining element going to the substance of the age-old formula, and it would not be safe to say that such was not the understanding of the jury. Compare *State v. Mangano*, 77 *N. J. L.* 544 (*E. & A.* 1909.) Refinements plainly import a modification of the text; if not, why amplify?

And for the reasons given in the dissenting opinion in *State v. Bunk*, 4 *N. J.* 461 (1950), it was reversible error to refuse to charge the accused's requests for a direction that there must be unanimity in the verdict both as to guilt and punishment.

I would reverse the judgment and award a new trial.

WACHENFELD, J., concurring in result.

*For affirmance*—Chief Justice VANDERBILT, and Justices OLIPHANT, WACHENFELD, BURLING, JACOBS and BRENNAN—6.

*For reversal*—Justice HEHER—1.