STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v. MARTIN REYNOLDS AND MICHAEL REYNOLDS, DEFENDANTS-APPELLANTS.

Argued September 24, 1963—Decided November 18, 1963.

*Mr. Joseph Lordi,* Assistant Prosecutor of Essex County, argued the cause for plaintiff-respondent (*Mr. Brendan T. Byrne,* Essex County Prosecutor, and *Mr. Peter Murray,* Assistant Prosecutor, of counsel and on the brief).

*Mr. Philip J. Mylod* argued the cause for defendant-appellant Martin Reynolds.

*Mr. Richard M. Glassner* argued the cause for defendant-appellant Michael Reynolds (*Mr. Salvalore A. Brancato,* on the brief).

The opinion of the court was delivered by

PROCTOR, J. The defendants, Martin Reynolds and Michael Reynolds, brothers, were convicted of the robbery-murder of Fred Garcia. The jury did not recommend life imprisonment, and the defendants were sentenced to death. The defendants appeal to this court as of right pursuant to *R. R.* 1:2–1(c).

The facts on the issue of the guilt of both defendants were substantially undisputed; in fact, defendants frankly admitted their guilt and appealed to the jury to spare their lives. In their plea for mitigation of punishment, they introduced background evidence of their inadequate home life, slum environment, their histories of prior anti-social behavior and their addiction to narcotics.

The testimony of the eyewitnesses to the robbery and shooting established the following facts. On April 1, 1962, at about 7:00 P. M., Fred Garcia, 69 years old, was making sandwiches behind the counter of his confectionery store in Newark. His daughter Geraldine was behind the cigar counter near the front of the store. Several young boys were also in the store. The defendants entered the store; Martin went to the rear and stood in front of the counter opposite Garcia, and Michael stood by the cigar counter. Martin pointed a gun at Garcia and said, "Don't move. This is a stickup." Michael went behind the cigar counter, pushed Geraldine

aside, opened the cash register, and took $51 from it. When Garcia saw his daughter being pushed, he headed toward Michael with a knife in his hand, whereupon Martin shot at Garcia, hitting him in the back. Michael then ran out of the store, and Garcia and Martin ran to the door. A scuffle followed in which Martin fired the gun again and then ran out of the store. Garcia took a few steps and collapsed behind the counter.

After the shooting defendants went directly to the home of Dolores Brown, Martin's girl friend. She testified that Martin told her there had been a holdup and he had shot a man. He gave her the gun to keep for him, and the brothers then left in a taxicab. The following week, after a detective had visited her house, Dolores threw the gun into a sewer where it was later recovered by the police.

Within a few minutes after the shooting the police were on the scene and called an ambulance. The doctor who arrived with the ambulance pronounced Garcia dead. An autopsy performed later that night disclosed that death was due to a wound in back of the right chest caused by a bullet which perforated both lungs, with massive hemorrhages into both chest cavities. There were no blackening, scorching, or tattoo marks on the body, indicating that the weapon had been fired at least 20 inches away from the body. A bullet was found under the skin just below the left armpit.

Shortly after their arrival, the police searched the premises and the vicinity for expended bullets but found none. After questioning the eyewitnesses, they discovered a knife on the floor behind the counter.

On June 15, 1962 both defendants admitted their guilt in oral and written statements to the police. It was conceded that these statements were voluntary, and they were admitted into evidence without objection.

In his statement, Michael said that he lived in New York City and worked as a longshoreman; that on Sunday morning, April 1, 1962, he went to Newark to the home of his mother and father, with whom Martin was living. Dolores

Brown came to the house in the early afternoon. They sat and watched television and drank some gin. At about 6:00 P. M. he and Martin went with Dolores to her house where they listened to some phonograph records. Dolores fell asleep, and the brothers decided to go out and "make some money." Martin had a gun and suggested they stickup somebody with it. The brothers left the Brown house and worked out their plan as they walked down the street. Michael said they should find a store where there was an old man because he would be more afraid of a gun. Michael was to get the money and Martin was to hold the gun on the man. The defendants found a confectionery store open and looked inside. They saw an old man, a woman, and four customers in the store and decided to wait until the customers left. About five minutes later they went into the store. Michael's version of what happened in the store coincided substantially with the accounts of the eyewitnesses. After leaving the store the defendants returned to Dolores Brown's house and called a cab. In the cab the defendants split the money that Michael had taken from the store register. They stopped at a hot dog stand, and then Michael took a bus to New York.

Martin's statement related substantially the same facts as that of Michael regarding the events of the day. In addition, Martin stated that when his brother was bent over the cash register, Garcia ran at his brother with a knife, and Martin "tried to shoot him in the arm to stop him." When he attempted to leave the store, Garcia tried to cut at him with a knife, and he shot the gun again.

Shortly after the above statements were taken, the defendants were examined by Dr. Marcus H. Greifinger, Chief Surgeon of the Newark Police. Dr. Greifinger testified that both defendants admitted their participation in the robbery and shooting to him. The doctor found no evidence that either defendant had been mistreated in any way. Michael had numerous old tracks on both forearms with one recent scab on an old track of the right forearm. Martin had two old tracks on his left forearm. Tracks, the doctor explained, are

markings on the skin over a vein which has been damaged by the introduction of foreign substances. Later that evening, at the request of the police, both defendants were examined by Dr. Samuel R. Kesselman, a psychiatrist. The following day the defendants re-enacted the crime and were arraigned.

The theory of the defendants' case was that Michael was a narcotics addict suffering from withdrawal symptoms on the day of the crime and that the robbery was motivated by a desperate urge to get money to buy narcotics to relieve his suffering. Further, the shooting was prompted by Martin's protective concern for his brother; Martin did not intend to kill Garcia but meant only to disable him from attacking Michael. The defense also urged that the defendants were the victims of an inadequate home life in a slum environment which was to a large extent responsible for their anti-social behavior, which they pointed out had begun when they were nine or ten years old.

Dr. Aaron Smith, a psychologist, who had examined the defendants shortly before the trial, testified for the defense. He related at length the histories he had obtained from the defendants, their schooling, home environment, their membership in street gangs, their prior brushes with the law, and their use of narcotics. The records of Annandale Reformatory, where Martin had been incarcerated on two occasions, and the records of the Essex County Juvenile Court regarding his prior offenses were introduced in evidence on his behalf. Dr. Smith used these records in arriving at his diagnosis. He interpreted the background of both defendants and gave his opinion of the psychological and social factors which predisposed them to the commission of a violent crime. In his opinion, the brothers were the victims of inadequate parents who could not provide the time and love required in raising the brothers. As a result, their only source of human affection was each other, and an abnormal relationship developed between them—"More than just a brother relationship, it was brother, mother and father all rolled into one." Dr. Smith concluded from his examination of the defendants and their

prior history that both of them were exceedingly immature, distorted and dependent people.

Dr. Robert T. Latimer, a psychiatrist, was also called as a witness for the defense. He had interviewed the defendants and their parents a few weeks before the trial. He related the history given by them of their home and community environment, the defendants' prior offenses and their addiction to narcotics. He believed that there existed between Martin and Michael an abnormal relationship of love and affection, that Martin could not bear to see his brother suffer from the pains of withdrawal and, further, that Martin's shooting was an automatic response to Garcia's attack upon Michael. Dr. Latimer found that both defendants had below-average intelligence and sociopathic personalities. In his opinion the progressive anti-social behavior of the defendants, which had been allowed to proceed substantially unchecked, inevitably led to violence.

Martin Reynolds testified that his brother was a narcotics addict suffering from withdrawal symptoms on the day of the crime. The brothers were broke and unable to borrow money and planned the holdup to get money to buy narcotics to relieve Michael's suffering. Martin explained his failure to tell the police these facts when he gave them his statement by saying he was nervous at the time. When he left the house of Dolores Brown after the shooting, he went with his brother to New York to get a fix. In his written statement, he had said he went home to bed after leaving his brother in Newark. His failure to tell the truth in his written statement, he said, was due to his fear of getting into "deeper trouble" and his desire to hide his use of narcotics from his parents. Martin also testified that he was brought up in a rough neighborhood, that he joined a gang and drank wine when he was ten, that at the age of eleven or twelve he was smoking marijuana. He was sent to Annandale for stealing, released after fifteen months, and five months later was sent back for breaking and entering. On his second release he began using "goof balls" and "bennys," and five months prior to the robbery-shooting

he had begun using heroin. Martin was nineteen years old at the time of the crime; he had left school in the eighth grade at the age of fifteen.

Michael testified that he was forced to join a street gang when he was eight or nine years old and that he was drinking wine at nine. He started smoking marijuana when he was ten or eleven and then progressed to "goof balls," to sniffing heroin at fourteen, and to "mainlining," *i. e.*, injecting heroin into the veins, when he was nineteen or twenty. Michael was twenty-three at the time of the crime. He was permitted to show the jury his bare arms and point out the needle tracks on them. He further testified that when he was about fourteen years old he was arrested for stealing cars—"a regular gang activity." A year later he was arrested again for the same type of offense. He also testified that he was picked up for rape, but when he got to court, he was charged only with trespassing. On June 6, 1962 he was arrested on a narcotics charge. Michael testified that on the fatal day of April 1, 1962, he went to his mother's house to borrow money for narcotics because he was suffering from withdrawal symptoms. He admitted that his written statement said nothing regarding his withdrawal symptoms, but explained that he had previously told the police of that fact and that they didn't ask him about the withdrawal symptoms when the question-answer statement was taken.

Defendants' parents also testified as to the home life they provided for the defendants and the "rough neighborhood" in which they lived.

In rebuttal, the State offered the testimony of Dr. Samuel Kesselman, the psychiatrist who examined the defendants on the evening of June 15, after they had given their written statements to the police and had been examined by Dr. Greifinger. Dr. Kesselman recited the details of the offense as related to him by each of the defendants. The facts told to Dr. Kesselman substantially coincided with those given the police earlier that day. Dr. Kesselman also recited the family history and prior incidents of anti-social behavior of the de-

fendants which they had given to him. The doctor diagnosed Martin as "a sociopathic personality disturbance, anti-social reaction type," and Michael as having "sociopathic features in an emotionally unstable personality." In his opinion, the defendants were not motivated unconsciously by any neurotic compulsion, but their motive for the robbery was simply to obtain money.

I.

The defendants contend that at the outset of the trial the court committed error when in the presence of the jury it ruled that armed robbery was a felony. Counsel for Michael, after admitting his client's guilt of robbery, attempted to distinguish between an armed robbery in which a death occurs and the crime of premeditated murder. When the prosecutor objected that he need not prove premeditation under the State's theory of the case, a colloquy ensued among both defense counsel, prosecutor, and the court in which the law of felony murder was discussed. Defense counsel took the position that robbery was a high misdemeanor, not a felony, and that the robbery which they admitted was committed by their clients amounted to murder only by virtue of the statute and not because robbery is a felony. The court agreed but nevertheless concurred with the prosecutor in his characterization of robbery as a felony. Defense counsel now contend that the use of the word "felony" by the court might have led the jury to believe that the robbery was an aggravated one and might have thus predisposed the jury to impose the death penalty. This contention is of no substance since the indictment itself, which had been read to the jury, contained the word "feloniously." Moreover, the word "robbery" in the first-degree murder statute, *N. J. S. A.* 2A:113–2, means robbery at common law, *State v. Butler,* 27 *N. J.* 560, 590 (1958), and robbery at common law was a felony. Accordingly, the court's ruling was entirely proper. In any event, we cannot agree that the word "felony" would be more

inflammatory than the descriptive terms "robbery" and "armed robbery," which were used unhesitatingly by defense counsel in their opening statements.

## II.

Defendants assert that the court improperly limited their closing arguments to the jury.

Counsel for Michael, in arguing for leniency for his client, pointed out that capital punishment has been abolished and cannot be inflicted in many parts of the world, with or without mitigation. He then proceeded to quote a resolution of a religious convention indicating opposition to capital punishment. The prosecutor interrupted the quotation, asserting that the matter was not proper comment in view of the New Jersey law. The court sustained the objection, and counsel responded that since the jury had both the right and the duty to decide whether to impose capital punishment, he proposed to tell them "that the taking of human life is irreligious, that it is barbaric, brutal." Again the court sustained the prosecutor's objection.

Clearly the court was correct in prohibiting such a discussion. The law of the State must be administered as it presently exists, and the Legislature has provided for capital punishment in appropriate cases, *N. J. S. A.* 2A:113–4. Of course, defense counsel may urge that mitigating circumstances exist in the particular case before the jury which would justify the recommendation of life imprisonment. However, to urge that capital punishment *per se* is wrong and should be abolished is to suggest to the jury that they may go beyond their proper function and invade the province of the Legislature. It is improper for counsel to imply to the jurors that they have such power. As said by Justice Traynor in *People v. Love*, 56 *Cal. 2d* 720, 16 *Cal. Rptr.* 777, 366 *P. 2d* 33, at *p.* 35 (*Sup. Ct.* 1961), "Juries in capital cases cannot become legislatures ad hoc, and trials on the issue of penalty cannot be converted into legislative hearings." See also

*Commonwealth v. Sykes,* 353 *Pa.* 392, 45 *A.* 2d 43 (*Sup. Ct.* 1946); Knowlton, "Problems of Jury Discretion in Capital Cases," 101 *U. of Pa. L. Rev.* 1099, 1118 (1953).

Error is also claimed in the ruling of the court which limited defense counsel's general remarks on racial discrimination in housing, schooling and job opportunities. Defense counsel did not attempt to offer any evidence of racial discrimination at the trial. Whether such evidence would be admissible if offered to show the defendants' general background would depend on its reasonableness in the circumstances of the case as determined by the trial court in the exercise of its sound discretion. *State v. Mount,* 30 *N. J.* 195, 218 (1959). In the present case, when the prosecutor objected to defense counsel's protracted remarks on racial discrimination in America, the court properly limited the summation of counsel to fair comment on the evidence before the jury. Defendants cite *State v. Lang,* 75 *N. J. L.* 1 (*Sup. Ct.* 1907), aff'd 75 *N. J. L.* 502 (*E. & A.* 1907), aff'd 209 *U. S.* 467, 28 *S. Ct.* 594, 52 *L. Ed.* 894 (1908), for the proposition that counsel are entitled to the widest latitude in their summations. But that case specifically confines that latitude to "within the four corners of the evidence," 75 *N. J. L.,* at *p.* 8.

Defendants also contend that counsel for Martin in his summation was erroneously prevented from pointing out to the jury that Martin's prior offenses were for juvenile delinquency and not adult offenses. We are convinced from the context in which the remarks were made that this was not his purpose. Counsel told the jury that his experts had found that the defendants had a juvenile mentality. His next comment was that the juvenile court had exclusive jurisdiction of offenders under the age of sixteen. The implication that the juvenile court jurisdiction was in any way relevant to the mental age of these defendants was improper and prompted the prosecutor's objection which was properly sustained. *Cf. State v. Schilling,* 95 *N. J. L.* 145 (*E. & A.* 1920); *Commonwealth v. Trippi,* 268 *Mass.* 227, 167 *N. E.* 354 (*Sup. Jud. Ct.* 1929). In any event, sustaining the objection did not result

in prejudice to the defendants. The defense introduced Martin's juvenile offenses for the purpose of showing his sociopathic personality. The label that the law attaches to the underlying anti-social conduct, whether juvenile delinquency or crime, is for that purpose immaterial.

## III.

The defendants contend that it was improper for the trial court to permit Dr. Kesselman, the State's psychiatrist, to testify in rebuttal as to the defendants' anti-social history. They urge that this court in *State v. Mount, supra,* established the rule that only the defendant in a capital case could introduce background evidence on the issue of punishment; in short, that background evidence is a "one-way street" for the defendant alone. This court in *Mount* ruled that the defendant was entitled to offer general background testimony, within reasonable bounds, in order that the jury might intelligently perform its function of determining punishment. The question of whether the State could offer evidence in rebuttal was not before the court.

In the present case the proof offered by the State was in the same area which the defendants had explored. The defendants took the stand and described to the jury their early environment, schooling, drug addiction, and anti-social behavior, including gang activities and prior arrests. The defense psychologist and psychiatrist each testified at length as to the sociopathic personalities of these defendants based on their examinations of them, the histories given by them, and the official records of Martin's juvenile offenses and incarceration. In presenting this evidence, the defense sought to show a pattern of prior anti-social behavior culminating inevitably in a violent crime and indicating the character or personality defects at the root of the defendants' behavior, in order to mitigate their criminal responsibility in the eyes of the jury. When a defendant offers background evidence, it is to be expected that he will present only those factors in his back-

ground which might influence the jury to mitigate punishment. Surely fairness to society requires that the jury consider unfavorable as well as favorable factors in the defendant's background in the area opened up, and the State should be permitted in rebuttal to meet the proof introduced by the defendant on the issue of punishment. Of course, as pointed out in *Mount,* all background evidence must be kept within reasonable limitations in the circumstances of the particular case, and the trial judge will exercise his sound discretion in balancing the probative value of the evidence against the cost of undue consumption of time or the threat of confusion of issue, prejudice, or surprise. See Handler, "Background Evidence in Murder Cases," 51 *J. Crim. Law* 317 (1960). In the present case the trial judge did not misuse his discretion in permitting Dr. Kesselman to testify in rebuttal for the State.

However, defendants raise additional objections to the testimony of Dr. Kesselman. Each defendant had related to him the facts and circumstances of the robbery-murder and, in addition, had told him of some of their prior anti-social behavior. Dr. Kesselman was permitted, over objection, to repeat, as the basis for his expert opinion on the character and personality of each defendant, the statements given him by the defendants. On this appeal, defendants contend that even if *Mount* permits the prosecutor to rebut background evidence introduced by the defendants, the admission of these statements was improper for the following reasons.

(1) The court erred in not making a preliminary determination as to the voluntariness of the statements.

(2) It is improper for the prosecutor to elicit any information regarding previous arrests unless they resulted in conviction for crimes.

(3) A juvenile offense is not a crime.

(4) Convictions may only be elicited to impeach credibility.

First, defendants urge that the trial court erred in admitting their oral confessions to Dr. Kesselman without requiring the State to establish their voluntariness on *voir dire* examination.

We fail to see how any prejudice can have resulted from the admission of these statements. This is not a case where the State offers a confession as part of its case in chief to establish guilt. See *State v. Tassiello*, 39 *N. J.* 282 (1963). Here the defendants had testified to their guilt; they had conceded the voluntariness of substantially identical confessions to the police; and their own experts had testified to similar confessions of their guilt. Moreover, the defendants did not suggest to the trial court, nor do they on this appeal, that they were in any way mistreated before or at the time of their examination by Dr. Kesselman. The purpose of Dr. Kesselman's testimony was not to establish guilt but solely to rebut the expert testimony of the defense regarding the personality and character defects of the defendants. The statements made to him were a necessary element in the formulation of his expert opinion and, accordingly, it was proper for him to testify to their contents.

Defendants' contention that evidence of their prior arrests and juvenile offenses is inadmissible misconceives the purpose for which such evidence was offered in this case. Prior arrests not resulting in convictions are excluded from evidence because of their lack of probative value in determining credibility or character. Juvenile offenses are also excluded because the Legislature has determined that they are not to be deemed criminal offenses, and accordingly, they may not be used to impeach credibility. *State v. Wolak*, 26 *N. J.* 464, 482 (1958). Further, evidence of prior convictions of the defendant is normally excluded, except to affect credibility, because of the probability that such evidence may influence the jury on the question of guilt. Where, as here, guilt has been admitted, and in mitigation of punishment the defendants have offered evidence of prior anti-social behavior, including prior arrests, juvenile offenses, and convictions, the reasons for these exclusionary rules disappear and the State in rebuttal should not be precluded from eliciting similar information regarding the defendants' prior misbehavior. Of course, the admissibility of such evidence will be determined by the trial court in the

exercise of its discretion under the standard enunciated in *Mount, supra.* Here, the trial court was well within its discretion in admitting the testimony of Dr. Kesselman, which recited incidents of prior anti-social behavior told him by the defendants themselves. The defendants do not contend that the statements were not made to Dr. Kesselman or that they were untrue.

A related contention of the defendant Martin concerns the voluntariness of his oral confession to Dr. Greifinger made during the course of his medical examination shortly after Martin had confessed to the police. Dr. Greifinger was called by the State in its case in chief, and a *voir dire* examination was conducted at the request of Martin's counsel to determine the voluntariness of his statement. The doctor testified that Martin was not mistreated in any manner, that he was oriented to his surroundings and was responsive to the questions put to him. On cross-examination, the doctor testified that he did not advise Martin that anything he might say regarding the commission of the crime might be used against him in a trial, nor did he inform him of his right to counsel. Defense counsel's objection to the admission of Dr. Greifinger's testimony was overruled, the court finding as a fact that the answers Martin made were voluntarily given. On this appeal, Martin's counsel urges that the failure to advise Martin of his rights rendered the statement to the doctor involuntary and inadmissible. This contention is without merit.

A confession is not involuntary merely because it was made without the accused having been cautioned that it might be used against him or because he was not advised of his constitutional or legal rights. *State v. Pierce,* 4 *N. J.* 252, 261 (1950). Whether the accused has been so advised is a factor for the trier of the facts to consider, together with all the other circumstances under which the confession was obtained, in determining whether the State has established that the will of the accused was not overborne and that the fundamental fairness requirement of the due process clause was not violated. *Ibid; State v. Fauntleroy,* 36 *N. J.* 379, 395 (1962).

In the present case, the trial judge considered all the circumstances under which the statement was given to Dr. Greifinger, and from our reading of the record we are satisfied that his finding of voluntariness was correct.

## IV.

Defendant Martin asserts that rulings of the trial court excluding certain questions which sought the opinion of his psychologist, Dr. Smith, as to Martin's motivation, restricted him in developing fully the underlying reasons for the crime. Counsel was allowed a wide latitude in questioning defendant Martin as to his underlying motivation, *i. e.*, that Martin committed the robbery in order to obtain money with which to satisfy Michael's craving for narcotics and, further, that he shot Garcia to prevent him from attacking Michael. But it is urged that Martin's credibility was weakened by his self-interest and that corroborative testimony was essential to the defendants' case. Dr. Smith was permitted to testify as to the mutual dependence of the brothers, their use of narcotics, and the abnormal reaction which might be expected from Martin if Michael were attacked, thus corroborating the underlying factors in motivation from which the jury could conclude that the defendant had testified truthfully as to his motive. Moreover, additional corroboration of motive was developed at length through the testimony of the defense psychiatrist, Dr. Latimer. The court in our judgment gave the defendants full latitude to adduce through Dr. Smith the maximum contribution that any expert could make to the resolution of the question as to Martin's motivation for the crime. Under the circumstances, we are convinced that the trial court did not abuse its discretion in excluding the testimony.

## V.

Defendants urge that the State's failure to produce the knife which the deceased used to attack Michael prejudiced the defendants' right to a fair trial. This is not a case

where evidence in the possession of the State was suppressed. The State conceded that there was a knife, but unfortunately it was mislaid. In fact, the State produced two photographs of the knife found in the store and called witnesses who identified the knife in the photographs as the one which Garcia had in his hand at the time of the shooting. We see no basis of complaint nor any possible harm to the defendants.

## VI.

██ Prior to the trial the defendants moved for an inspection of the written reports and memoranda of Drs. Greifinger and Kesselman. The motion was denied, and defendants assert error. The State had already given the defendants copies of their written confessions to the police. Assuming without deciding that the defendants may have been entitled to those parts of the doctors' reports which contained their confessions as to the commission of the crime, we cannot see how the defendants were prejudiced in any way by the denial of their motion. In *State v. LaPierre,* 39 *N. J.* 156, 177 (1963), we held that on a post-conviction review of the denial of pretrial discovery, prejudice in fact must appear. The comments in the doctors' reports regarding the commission of the crime were essentially summaries of the facts contained in the confessions voluntarily made to the police and were not disputed by the testimony of the defendants at the trial.

██ The statements given to Dr. Kesselman by the defendants included admissions of other offenses of the defendants. *R. R.* 3:5–11 forbids pretrial inspection of written statements of prospective witnesses. *State v. Johnson,* 28 *N. J.* 133 (1958). Where, however, the defendant has made a statement to the prospective witness which is included in that witness's written report, the circumstances may justify relaxation of *R. R.* 3:5–11 under *R. R.* 1:27A, to permit inspection of that part of the witness's report which contains the defendant's statement. Relaxation should occur only in unusual circumstances, and the trial court must be given

broad discretion in determining when relaxation is warranted. Since the statements to Dr. Kesselman were not used by the State in its case in chief but only on rebuttal, and only for the limited purpose of establishing the basis for his expert opinion, we find no prejudice resulted from the failure to grant inspection prior to trial.

## VII.

■■■ We see no merit in the defendants' contention that the denial by the trial court of their request for adjournment deprived them of a fair trial. The motion for adjournment was based on certain newspaper articles and editorials regarding similar crimes and expressing the view that the courts had been too lenient in dealing with criminals. The trial court after hearing argument denied the motion without viewing the proffered clippings, although counsel read extensively from them during oral argument. Defendants now contend that the refusal of the court to view the materials amounted to a refusal to exercise discretion and therefore was an abuse of discretion. It is not contended that the court was unaware of or misconceived the general contents of the exhibits. Defendants cite no authority for the adjournment of a trial on the ground that crime, in general, has increased or received publicity. All of the cases which we have found in which adjournment or change of venue has been granted because of adverse publicity have dealt with situations where the publicity was directed at the particular crime and defendant before the court. See, e. g., Irvin v. Dowd, 366 U. S. 717, 81 S. Ct. 1639, 6 L. Ed. 2d 751 (1961) ; United States ex rel. Bloeth v. Denno, 313 F. 2d 364 (2 Cir. 1963) ; Delaney v. United States, 199 F. 2d 107 (1 Cir. 1952). The theory of these cases is that a defendant cannot receive a fair trial where the prospective jurors may have predetermined his guilt on the basis of out-of-court reports by newspapers and other news media. In the present case, the articles and editorials complained of did not refer to the defendants or the crime with

which they were charged. A detailed examination of the articles by the trial court was not required in order for it to exercise discretion, since counsel quoted in argument those parts of the articles which they considered most prejudicial. After a full discussion of the articles, the trial court in the exercise of its discretion concluded that no prejudice to defendants would result from a denial of adjournment. On the basis of defendants' showing, the decision of the trial court to deny the motion was well within the proper exercise of its discretion. See *State v. LaPierre, supra,* 39 *N. J.,* at *p.* 177; *State v. Wise,* 19 *N. J.* 59 (1955); *State v. Collins,* 2 *N. J.* 406, 411 (1949). Moreover, we have examined the newspaper articles submitted by the defendants, and we are satisfied that they would not create a community atmosphere which would in any way prejudice defendants' rights to a fair trial.

## VIII.

The defendants contend that a misstatement of facts by the prosecutor in his summation so inflamed the jury against the defendants as to deprive them of a fair trial. The prosecutor referred to the defendants as "two constant repeaters" and continued, "You have heard their testimony, their background, over and over again during the trial of this case, breaking and entry, larceny, breaking and entry, larceny, breaking and entry, larceny." Both defendants and their experts had testified to their numerous acts of breaking and entry and stealing. The defendants contend that these acts were all juvenile offenses, and therefore comment on them by the prosecutor was improper. As mentioned above, when the defendants place in evidence the nature of their juvenile offenses and rely on the specific acts involved to show a pattern of misconduct in mitigation of punishment, they cannot complain if the prosecutor adopts their factual statements and suggests to the jury that the pattern of offenses shown by defendants' testimony warrants a different conclusion. Since the remarks of the prosecutor were supported by the evidence,

there was no error in permitting them. Moreover, no objection was made to the remarks and the absence of objection indicates the probability that in the atmosphere of the trial defense counsel did not consider them improper. *State v. Johnson*, 31 *N. J.* 489, 511 (1960).

## IX.

Finally, it is contended that the trial court's instructions to the jury regarding punishment were erroneous.

The court charged the jury as follows:

"I shall now discuss with you, members of the jury, the matter of the substance and form of your verdicts, in the event that you find one or both of these defendants guilty of murder. First of all, it is mandatory that any verdict you may reach in respect to each of these defendants must represent a completely unanimous agreement by all twelve of the jurors who shall finally decide this case. There must be complete accord among all twelve as to every element of any verdict returned. I think it would be well for me to repeat at this time a provision of our statute that I earlier read to you. I quote:

'Every person convicted of murder in the first degree, his aiders, abettors, counselors and procurers, shall suffer death, unless, the jury shall by its verdict and as a part thereof, upon, and after the consideration of all of the evidence, recommend life imprisonment, in which case this and no greater punishment shall be imposed.'

This, members of the jury, is a first-degree case. On the evidence presented to you either or both of these defendants are guilty of murder in the first degree, or he or they are not guilty. We are not here concerned with any other degree of murder. In the event that you should find either of these defendants guilty of murder in the first degree, you must keep in mind that your duty in regard to that defendant does not end there. It is your duty to determine the character of the punishment that shall be imposed on that particular defendant. And in performing that duty you must have regard for and consider all of the evidence in the case, including the evidence relative to the background and the mental and emotional abilities and disabilities of each one of these defendants. You will recall that there has been a great deal of testimony and evidence bearing on these subjects, and matters of like kind in the course of this trial. And it is your function and your duty to evaluate all of them in reaching your conclusion on the matter of punishment."

Defendants object to the above charge which they say failed to inform the jurors clearly that they could not return a

verdict unless they were unanimous as to punishment. In this connection they refer to *State v. Bunk*, 4 *N. J.* 461 (1950), and *State v. Tune*, 17 *N. J.* 100 (1954), which they say we should overrule. In *Bunk*, the court said:

"[T]he purpose of the jury is to determine guilt, the punishment being fixed by legislative enactment [*N. J. S. A.* 2A:113–4], and that punishment [death] must be imposed unless the jury by their verdict make a contrary disposition. Before that contrary disposition can be made it must be agreed upon by the jury unanimously or else the death penalty attaches." (4 *N. J.*, at *p.* 476)

In *State v. Molnar*, 133 *N. J. L.* 327 (*E. & A.* 1945), it was held that it is the statute, not the jury, which determines the punishment, that the character of the sentence is not in issue at the trial, but that the only issue is guilt or innocence. Only proof relevant to that issue was admissible.

In reliance on the holding in *Molnar* that the character of punishment was not an issue in the case, the court in *Bunk*, *supra*, took the view that under the statute the jury must first consider the issue of guilt and then, if the defendant was found guilty, as a second step the jury were to consider whether to recommend life imprisonment. Under this view, when the jury reached their unanimous decision on guilt the statute immediately came into play and the death penalty attached. As a separate and mitigating consideration, the jury could then by unanimous vote agree to recommend life imprisonment.

In *State v. Mount, supra*, this court reconsidered the statutory duty imposed on the jury with regard to punishment and held that not only was the issue of guilt before the jury, but also in issue was the character of the punishment, whether life or death. See also *State v. White*, 27 *N. J.* 158, 177 (1958). And as a necessary corollary to this view, it was held that evidence relative to punishment was admissible within reasonable limitations. Since *Bunk* relied on the *Molnar* holding that punishment was not an issue in the case, we believe that a reconsideration of *Bunk* is required in the

light of the recent expansion of the jury's function announced in *Mount.*

If, in accordance with *Mount,* the jury is to determine whether the punishment shall be life imprisonment or death, then it is clear that a verdict of guilty without a recommendation must include, as a part thereof, the jury's determination that the defendant shall suffer death. And since it is fundamental that all verdicts must be unanimous, *State v. Cordasco,* 2 *N. J.* 189, 202 (1949), the jury in returning a verdict of guilty without a recommendation must have reached a unanimous agreement that the defendant shall suffer death. See *Knowlton op. cit., supra,* at *pp.* 1125–1128.

Although defendants ask us to reconsider *Bunk* and *Tune,* it is to be noted that in those cases the defendants had specifically requested the court to charge that the jury must come to a unanimous conclusion as to whether a defendant is to suffer the death penalty. No such request was made in the present case. *Cf. Cordasco, supra.* Nevertheless, we agree that the rule enunciated in *Bunk* and *Tune* does not comport with the expanded function of the jury as delineated in *Mount.* Under *Mount,* the jury must accept the full responsibility for determining the penalty to be imposed as directed by the statute and, accordingly, their verdict must be unanimous as to punishment as well as guilt. We do not believe the Legislature intended that a man should go to his doom because one juror disagreed with eleven who thought life imprisonment was the just penalty. This view accords with the interpretation of similar statutes elsewhere. *People v. Hall,* 199 *Cal.* 451, 249 *P.* 859 (*Sup. Ct.* 1926) ; *People v. Hicks,* 287 *N. Y.* 165, 38 *N. E. 2d* 482, 138 *A. L. R.* 1222 (*Ct. App.* 1941) ; *Andres v. United States,* 333 *U. S.* 740, 68 *S. Ct.* 880, 92 *L. Ed.* 1055 (1947). *Contra: Commonwealth v. McNeil,* 328 *Mass.* 436, 104 *N. E. 2d* 153 (*Sup. Jud. Ct.* 1952).

In light of the above, we have examined the trial court's instructions to determine whether the jury were properly advised of their responsibility to determine punishment. The jury were told several times that it was their duty to

determine whether the defendants were to live or die. They were also told unequivocally that their verdict must be unanimous. Moreover, they were instructed, "There must be complete accord among all twelve as to every element of any verdict returned." We are convinced that the jury fully understood from these instructions that their decision as to punishment, whether death or life imprisonment, required unanimity. We therefore find no error in the court's charge in this respect.

### X.

We have carefully reviewed the other points raised by the defendants but find them without merit and not of sufficient substance to warrant discussion.

The judgment is affirmed.

HANEMAN, J. (concurring). I concur in the opinion of the majority, except insofar as that opinion under heading IX changes the law enunciated in *State v. Bunk*, 4 *N. J.* 461 (1950), and *State v. Tune*, 17 *N. J.* 100 (1954).

Prior to 1916 a verdict of guilty of murder in the first degree automatically carried with it a mandatory death sentence, under *L.* 1898, *c.* 235, *sec.* 108, which provided:

"Every person convicted of murder in the first degree, his aiders, abettors, counselors and procurers, shall suffer death * * *."

In that year, the Legislature amended the 1898 statute to read as follows:

"Every person convicted of murder in the first degree, his aiders, abettors, counsellors and procurers, shall suffer death unless the jury at the time of rendering the verdict in such case shall recommend imprisonment at hard labor for life, in which case this and no greater punishment shall be imposed * * *." *L.* 1916, *c.* 270.

In 1919 the Legislature again amended the 1898 statute to read:

"Every person convicted of murder in the first degree, his aiders, abettors, counsellors and procurers, shall suffer death unless the jury shall by their verdict, and as a part thereof, upon and after consideration of all the evidence, recommend imprisonment at hard labor for life, in which case this and no greater punishment shall be imposed * * *." *L.* 1919, *c.* 134, now *N. J. S.* 2A :113–4.

The history of these amendments has been adequately treated in *State v. White,* 27 *N. J.* 158 (1958).

In *State v. Bunk, supra* (1950), 4 *N. J.,* at *p.* 476, this court, in construing *N. J. S.* 2A :113–4, concluded that "the purpose of the jury is to determine guilt, the punishment being fixed by legislative enactment and that punishment [death] must be imposed unless the jury by their verdict make a contrary disposition. Before that contrary disposition can be made it must be agreed upon by the jury unanimously or else the death penalty attaches." Mr. Justice Heher wrote a strong dissenting opinion expressive of the thesis of the majority in the instant matter. In 1954 this court reaffirmed *State v. Bunk* in *State v. Tune, supra.* Thus it is seen that the judicial construction accorded the statute by this court in *Bunk* has stood for 13 years, reaffirmed in *Tune* nine years ago. The Legislature has not seen fit to amend the statute to adopt the views of Justice Heher set forth in the *Bunk* dissent, or to otherwise alter the conclusion of the majority in that case. This legislative inaction for 13 years signifies, I take it, legislative acquiescence in the *Bunk* and *Tune* conclusion. *Egan v. Erie R. Co.,* 29 *N. J.* 243 (1959), *Asbury Park Press v. City of Asbury Park,* 19 *N. J.* 183 (1955). The majority decision herein would appear to me to breach the policy against judicial legislation. If a departure from the *Bunk* and *Tune* statutory construction is desired, for policy reasons or otherwise, it should not now be by judicial action but rather by legislative action.

In any event, it seems to me that the death penalty, in the very language of the act, is automatic upon a finding of guilt unless a jury unanimously recommends life imprisonment. I find nothing in the statute which raises any doubt that this

result was intended. I am confirmed in my opinion that the Legislature so intended from a reading of the report of the New Jersey Senate "Committee to Inquire into the Subject of Capital Punishment" of 1908 which, in the language of our Chief Justice in *State v. White,* 27 *N. J.* 158, 173 (1958), "foreshadowed" the 1916 amendment. The report, at *p.* 37, suggested:

"For particularly revolting and heinous crimes, involving in their perpetration a great degree of moral wrong, it does not seem wise or sound as a matter of state policy to entirely abolish the death penalty, especially so if the guilt of the accused is supported by direct and positive evidence.

Could not all such cases be properly provided for by some arrangement whereby the jury in *bringing in a verdict* for murder in the first degree could state the nature of the punishment by adding the words *'with capital punishment'* or 'without capital punishment?' " (Emphasis supplied)

The Legislature patently decided to ignore the Committee recommendation which in plain and unambiguous language would have added to a murder trial the issue of "capital punishment or no capital punishment" and instead, in 1916, adopted the language which, to me, clearly makes the issue to be "recommendation of life imprisonment or no recommendation of life imprisonment." That the Legislature understood that *L.* 1916, *c.* 270 was intended to make the death penalty automatic unless the jury recommended life imprisonment is strengthened by the statement appended to the bill which eventually became *L.* 1919, *c.* 134, which reads in part:

"In the Martin case [*State v. Martin,* 92 *N. J. L.* 436], the Court holds that, under the language of the Act of 1916, the jury are not bound to consider the evidence in determining whether to make or refuse a recommendation. The purpose of this is to make it clear that the recommendation is a part of the verdict, and that in determining *whether or not the recommendation shall be made,* the jury shall consider all the evidence in the case." (Emphasis supplied)

Nor do I find anything in *Mount* which requires the conclusion that the "character of the punishment, *whether life or*

*death"* (Emphasis supplied), rather than recommendation for life imprisonment, as well as guilt, is an issue in a murder trial. The difference in the statements of the issue additional to guilt connotes more than a semantic distinction. If the former were the true concept of the meaning of the statute it would follow that where the jury finds a defendant guilty of murder in the first degree without a recommendation of life imprisonment, for capital punishment to follow, the jury would be obliged to include in its verdict a specific statement either (1) that the defendant "shall suffer death" or (2) that the verdict is without "recommendation of imprisonment at hard labor for life." This is something never, to my knowledge, done or required to be done in this State. A verdict of guilty of murder in the first degree, without any further statement appended, has always carried with it the death penalty. The recognized effect of a simple "guilty" verdict, in and of itself, demonstrates that a verdict of guilty of murder in the first degree automatically brings into play the death penalty and has so been regarded since the adoption by the Legislature in 1916 of *c.* 270. That the Legislature intended in 1916 to ameliorate the harshness of the punishment as it existed prior to the amendment of that year, *only* where a jury affirmatively decides upon life imprisonment, and has continued to harbor that intention, is borne out by the public and judicial recognition for 47 years of the above cited effect of a "guilty" verdict. This practical construction of the plain statutory language strengthens the conclusion that the death penalty, although unexpressed, automatically accompanies a guilty verdict, unless the jury unanimously decides that it shall be life imprisonment.

The jury then, must approach a verdict under *N. J. S.* 2A:113–4 in two stages: (1) guilt or innocence; (2) possible modification of the death penalty which automatically attaches to a finding of guilt. Unless the jury unanimously agree to modify the death penalty, then that recommendation cannot be appended to the guilty verdict and it follows that the verdict of guilty with the unexpressed death penalty

shall stand. Thus the two issues under *N. J. S.* 2A:113–4 are guilt or innocence and recommendation or no recommendation of life imprisonment, both of which would have to result from a unanimous verdict, and the jury should be so instructed.

I appreciate that *People v. Hicks*, 287 *N. Y.* 165, 38 *N. E.* 2d 482, 138 *A. L. R.* 1222 (*Ct. App.* 1941), construing the New York statute which is phrased somewhat differently from our statute, reached a result contrary to my above-stated views by a four to three vote. However, I am persuaded by the reasoning of the dissenting opinion rather than by that of the majority. What was there said is as well applicable to our act. Judge Finch reasoned in the dissent (38 *N. E.* 2d, at 488, 138 *A. L. R.* 1222)

"A majority of the Court would have us say that the Legislature, in granting this permissive power to the jury, meant also that unless the jury should reach an agreement in reference to this mitigation of punishment, no verdict of guilt can be had. The statute does not so provide, and it is submitted that in the absence of any language in the statute lending itself to that construction, no intention of the Legislature to that effect should be inferred. It is the function of the Court to read the statute as it was written by the Legislature. The Legislature has modified the rigidity of our Penal Law by providing that a unanimous jury may, by its recommendation, save the defendant from the punishment of death, but it has not gone further and provided that a defendant guilty of murder in the first degree may avoid conviction because a single member of the jury does not concur in refusing to recommend leniency.

A majority of the Court are using the words, 'as a part of its verdict' to mean not only as a part of the verdict, which would be satisfied by an accompanying recommendation unanimously agreed upon, but also to include a meaning that the verdict of guilty although found by the jury cannot continue to prevail until the jury either votes a recommendation unanimously or *unanimously* fails so to do. An examination of this decision reveals that if the Court holds that the jury must be unanimous on the question of the recommendation and can make no finding of guilt unless they also either make or unanimously reject a recommendation for mercy, then although the jury unanimously finds a defendant guilty of murder in the first degree, no verdict may be had if one juror, although he agrees that the defendant is guilty of felony murder, insists upon voting for a recommendation for life imprisonment."

The charge in the case *sub judice* was sufficiently broad to encompass the theory of the majority herein. I consider that this accorded the defendant a more favorable treatment than the law requires. Hence, although in my opinion it was erroneous, the defendant suffered no prejudice.

I would affirm.

HANEMAN, J., concurring in result.

*For affirmance* — Chief Justice WEINTRAUB, and Justices JACOBS, PROCTOR, HALL, SCHETTINO and HANEMAN—6.

*For reversal*—None.