397 F.2d 131
 Application of Michael REYNOLDS for a Writ of Habeas Corpus, Michael Reynolds, Appellant.
Application of Martin REYNOLDS for a Writ of Habeas Corpus, Martin Reynolds, Appellant.
 No. 16664.
 No. 16665.
 United States Court of Appeals Third Circuit.
 Argued April 5, 1968.
 Decided July 2, 1968.
 
 Richard M. Glassner, Newark, N. J., for appellant in No. 16664.
 Philip J. Mylod, Mylod & Feinberg, Newark, N. J., for appellant in No. 16665.
 Alan Silber, Newark, N. J., for appellee (Joseph P. Lordi, County Pros. of Essex County, Newark, N. J., James R. Zazzali, Asst. Pros., of counsel and on the brief), for plaintiff-respondent.
 Before KALODNER, GANEY and VAN DUSEN, Circuit Judges.
 VAN DUSEN, Circuit Judge.
 
 
 1
 This appeal is from the denial of appellants', Michael Reynolds (Michael) and Martin Reynolds (Martin), petitions for writs of habeas corpus (Civil Actions Nos. 244-65 and 255-65, respectively), sought pursuant to 28 U.S.C. § 2241(a), (c) (3) et seq. The District Court summarized the facts in its opinion of March 14, 1967, 287 F.Supp. 666:
 
 
 2
 "Petitioners were indicted by an Essex County Grand Jury on July 23, 1962 for the murder of Fred Garcia, the owner of a store located at 938 Bergen Street, Newark, New Jersey. Mr. Garcia died as a consequence of a bullet wound inflicted by Martin Reynolds [19] on April 1, 1962 while he and his brother, Michael Reynolds [23], were robbing the store. Petitioners were prosecuted by indictment pursuant to the provisions of N.J.S.A. 2A:113-2 whereby a person engaged in the commission of a felony during which the death of another occurs is guilty of murder in the first degree. It is further provided by N.J.S.A. 2A:113-4 that `every person convicted of murder in the first degree, his aiders, abettors, counselors, or procurers shall suffer death unless the jury by its verdict, and as a part thereof, shall, after consideration of all of the evidence, recommend life imprisonment in which case this and no greater punishment shall be imposed.' (Emphasis supplied)
 
 
 3
 "A jury found each petitioner guilty of murder in the first degree without recommendation of life imprisonment. Thereupon each of petitioners was sentenced to death on November 10, 1962."[1]
 
 
 4
 We agree that the District Court properly denied the petitions but point out our particular reasons for affirmance with respect to certain of the numerous contentions pressed both below and on this appeal.
 
 
 5
 As the District Court emphasized, the trial of appellants had the particular posture of being a trial solely on the issue of the possible recommendation of life imprisonment. Accordingly, the extent of the sentence, life imprisonment or the death penalty, was all the jury had to determine. This singular purpose of the trial is made abundantly clear in the statements of defense counsel quoted at length in the able opinion of the District Court.[2]
 
 I.
 
 6
 As grounds for granting their writs of habeas corpus, the appellants argue vigorously that their death sentences are constitutionally infirm because their written and oral confessions given to the police were coerced and involuntary. Appellants contend they were neither advised of their rights nor allowed to have counsel prior to making oral confessions to the police, followed by signed written statements. This contention we find without merit because the state court record clearly shows that appellants' counsel deliberately, unequivocally, and reasonably waived any objection to such confessions and their admission into evidence. It was not feasible to have the confessions admitted solely with respect to the issue of appellants' admitted "guilt", yet with constitutional objections reserved with respect to the issue of the possible recommendation of life imprisonment. The waiver in this case was complete, with a specific statement of "no objection" from each of appellants' counsel with respect to the admissibility of each of the two written confessions (Exhibits S-20 and S-21). In addition, as the District Judge pointed out, counsel for the appellants also conceded in unequivocal terms that both confessions were voluntary.[3]
 
 
 7
 By the above-mentioned reiterated explanations to the jury both that guilt was admitted and that the contents of Exhibits S-20 and S-21 were voluntarily given, counsel made an intelligent waiver of any constitutional objections to the confessions or their use as evidence that satisfies the standard of Johnson v. Zerbst, 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938): "an intentional relinquishment or abandonment of a known right or privilege," as that standard has been explained and made applicable to habeas corpus determinations in Fay v. Noia, 372 U.S. 391, 438-439, 83 S.Ct. 822, 9 L.Ed.2d 837 (1963); cf. Henry v. State of Mississippi, 379 U.S. 443, 451-452, 85 S.Ct. 564, 13 L.Ed. 2d 408 (1965). Particularly are we convinced that the extensive waiver constituted deliberate trial tactics in light of the opening remarks and summations of both defense counsel quoted in part above. The waiver was part of their case from the outset, obviously noticed by appellants even if they had not been consulted beforehand,[4] and part of a reasonable strategy in view of the many witnesses in the store at the time of the robbery and shooting whose testimony would probably have made such confessions superfluous had guilt been contested.[5] A reading of the record as a whole convinces us that the waiver was part of a plan to have appellants make as favorable an impression as possible upon the jury in order to secure their mercy. It would obviously help their cause with the jury the fewer factual problems they presented that concerned the shooting of a 69-year-old man and that demanded a jury assessment of their credibility or lack of it. As such, and in light of the clarity of counsel's position, the waiver in this case more than equals the effective waiver outlined in Henry v. State of Mississippi, supra, at 451, 85 S.Ct. 564. Since, as to certain doctors' statements discussed below, defense counsel made later objections to other evidence on the grounds of involuntariness, there is no doubt in this case that the right waived to object to S-20 and S-21 was "knowingly" waived.
 
 II.
 
 8
 The appellants' second main contention of constitutional infirmity concerns the testimony of two doctors who testified for the prosecution. The most vigorous arguments concern the testimony of Dr. Kesselman, a psychiatrist who examined both appellants for the state. Although, at the time of the trial, counsel objected only on the grounds of lack of proper foundation and improper rebuttal, appellants here contend that the details of the crime, as recounted in Dr. Kesselman's "history" of the appellants taken when they were examined, should not have been admitted by the court because the doctor failed to advise or warn appellants of their constitutional rights before they gave their version of the crime to him. It is further argued that, because the doctor's testimony revealed a different series of events surrounding the shots, and where each appellant was at those times, and because the testimony suggested that Martin deliberately shot Garcia and knew he had wounded him, the doctor's "history" contradicted the testimony of the appellants given earlier on the stand. In the appellants' case, their testimony maintained that Martin tried to shoot the knife from Garcia's hand to protect his brother and that after Michael ran out of the store, the gun discharged a second time while Martin wrestled with Garcia, who tried to block his escape from the store. Since Dr. Kesselman's version of the crime contradicted the appellants' testimony, the appellants contend that the inadmissible testimony of their "history" prejudiced their chance to get a "life" recommendation from the jury.[6]
 
 
 9
 Our examination of the record and a comparison of the written statements given to the police with the version of the crime given to Dr. Kesselman and repeated by him on the stand,[7] convinces us "beyond a reasonable doubt" that appellants were not prejudiced in any way by the doctor's testimony of the appellants' description of the events in the store on April 1, 1962.[8] Dr. Kesselman's version of the appellants' story — the number of shots, the position of the appellants at each shot, the knowledge of Martin that he hit Garcia, etc. — do not vary from the version of the crime given to the police and allowed into evidence without objection, as outlined above. Any contradictions, whether prejudicial or not, result solely from the variations in the details given by the appellants in their testimony at the trial and a contradiction between the statements (S-20 and S-21) of the two brothers. Dr. Kesselman's testimony added nothing to the confessions admitted earlier in the trial,[9] as to which appellants fully waived all objection.
 
 
 10
 The same lack of prejudice is even clearer with regard to Dr. Greifinger's testimony.[10]
 
 III.
 
 11
 We concur with the opinions of the New Jersey Supreme Court [State v. Reynolds, 43 N.J. 597, 206 A.2d 750, 754 (1965)][11] and of the District Court (pp. 8-10 of 3/14/67 Opinion in D.N.J., Civ. 244-65 and 255-65) that the charge on the subject of the jury's right to recommend life imprisonment did not violate any guarantee of the Constitution of the United States. Andres v. United States, 333 U.S. 740, 747-749, 68 S.Ct. 880, 92 L.Ed. 1055 (1948), relied on by appellants, was based on the interpretation of a Congressional statute (The Act of January 15, 1897, 29 Stat. 487, as later incorporated in 18 U.S.C. § 567 as worded in 1943), which contained different language than that contained in N.J.S.A. 2A:113-4.[12] Similarly, the language before the court in Frady v. United States, 121 U.S.App.D.C. 78, 348 F.2d 84 (1965), which is contained in 22 D.C.Code § 2404 (Supp. IV, 1965), is quite different from the above-cited New Jersey statute. Furthermore, the only majority opinion in that case was a two-sentence Per Curiam Opinion (p. 85 of 348 F.2d) and the quotations relied on in appellant Michael Reynolds' brief are from various separate opinions filed.
 
 
 12
 It is noted that Judge McGowan's opinion (348 F.2d at 91-95) would apparently approve the procedure of remanding a case, under circumstances such as this where guilt was admitted, for retrial on the issue of the possible recommendation of life imprisonment only, even if a new trial were required. Cf. State v. Laws, 50 N.J. 159, 233 A.2d 633, 648 (1967) and 51 N.J. 494, 242 A.2d 333. (opinion of May/6/68); United States ex rel. Rivers v. Myers, 384 F.2d 737, 743 (3rd Cir. 1968).
 
 IV.
 
 13
 The appellants' several other contentions are fully discussed and correctly answered by the above-mentioned able opinion of the District Court judge dated March 14, 1967.
 
 
 14
 Accordingly, the order of the District Court, denying the applications for writs of habeas corpus, will be affirmed.
 
 
 
 Notes:
 
 
 [1]
 As the District Court added:
 "Petitioners appealed their conviction in the New Jersey Supreme Court where it was affirmed. State v. Reynolds, 41 N.J. 163, 195 A.2d 449 [1 A.L. R.3d 1438] (1963). Thereafter, certification [sic — certiorari] was denied by the United States Supreme Court, 377 U.S. 1000 [84 S.Ct. 1930, 1934, 12 L.Ed.2d 1050] (1963) and rehearing denied 379 U.S. 873 [85 S.Ct. 22, 13 L. Ed.2d 80, 81] (1964). Petition for post conviction relief and stay of execution was denied by the Essex County Court on November 13, 1964. The Supreme Court affirmed. State v. Reynolds, 43 N.J. 597, 206 A.2d 750 (1965)."
 Appellants, having thus exhausted their state remedies, then sought relief in the District Court.
 
 
 [2]
 Counsel for Martin Reynolds stated in his opening:
 "Now, you notice I did not say that these defendants would be entitled to an acquittal at your hands. And that very statement is something that I have never said before. I have really delivered the life of the defendant Martin Reynolds, I have handed it up. We do not deny our guilt of an intent to commit a robbery. Martin Reynolds went into that store. Martin Reynolds squeezed the trigger that sent that bullet into the body of Frederick Garcia. But we do deny — and that's why we are here — that this was a wilful, felonious killing, cold, ruthless killing with malice aforethought. And so we are here to test solely the issues of penalty, of punishment. You ladies and gentlemen are the arbiters of the facts in this case. You are the judge of the facts, all of the facts in this case, including the ultimate fact of guilt or innocence, and the still more ultimate fact — if there can be any more ultimate fact — of the awful judgment. You are to determine whether, insofar as my client Martin Reynolds is concerned, whether it is going to be life or death. Now, I can't place it on the line any fairer or any squarer than I have."
 Counsel for Michael Reynolds stated in his opening:
 "The question of punishment is a question of the degree of our sin, the degree of evil, which is a slang way of saying the same thing. We admit that at sundown, Sunday, April 1, 1962, Michael Reynolds entered the premises at 938 Bergen Street in concert with his brother Martin for the purpose of robbing that place. Martin went in first. Martin had a gun. Michael went in second. Michael did not have a gun. Michael knew that Martin had a gun, but Michael did not know that the gun would be used for any but the purpose of intimidation. Even if a shot were fired he did not contemplate that that would be done but for the purpose of intimidation."
 Counsel for Michael Reynolds reiterated in summation that the only issue was the question of whether life imprisonment or death should be imposed:
 "On April the 1st of this year an innocent man was invaded in his humble place of business, a man who worked two days for a day and seven days for five, lived in a few rooms in the back and earned his humble subsistence. This man was robbed. This man was murdered. And yet this is the end of the second week in which we are trying that case. Exactly what are we trying? Certainly, we are not trying to find out whether the defendants are guilty or innocent. We start with that. They are guilty. They wilfully, knowingly entered the premises for the purpose of robbing. A death has resulted during this adventure and it does not matter legally whether the death was intended, and I admit that his Honor will so charge you. It would not matter even if the death were accidental or even of a fellow-defendant — or rather a fellow robber."
 
 
 [3]
 The record discloses the following statements made by Mr. Glassner, counsel for Michael Reynolds and by Mr. Mylod, counsel for Martin Reynolds:
 "MR. GLASSNER: I wish to state that the statement was voluntarily given.
 MR. LORDI: I understand there is an admission.
 MR. GLASSNER: Yes sir.
 MR. LORDI: This is with respect to the statement of Michael.
 MR. GLASSNER: Yes, sir. It was voluntarily given."
 * * * * *
 "Q. During all this time were any promises or offers of reward made to induce Michael or Martin Reynolds to sign each other's statements?
 MR. MYLOD: We will concede on behalf of Martin that there were no threats, promises or force.
 MR. LORDI: That is on behalf of Martin.
 MR. GLASSNER: The same.
 MR. LORDI: The same on behalf of Michael?
 MR. GLASSNER: Michael."
 In view of our decision, we do not have to reach the adequacy of the pre-statement warning of rights actually given to each appellant, a warning which concededly might be inadequate under normal circumstances.
 
 
 [4]
 The record has no indication of any kind that the individual defendants-appellants did not join in the waiver or that the factual circumstances of this case in any way impugn the effectiveness of counsels' waiver in behalf of their clients. Cf. Brookhart v. Janis, 384 U.S. 1, 4-7, 86 S.Ct. 1245, 16 L.Ed.2d 314 (1966)
 
 
 [5]
 Those who actually did testify were the victim's daughter, and three customers in the store at the time of the shooting. The testimony of these witnesses conformed substantially to the written confessions but some testimony contradicted certain details as to whether Michael was still in the store at the time of the first shot, whether Garcia picked up a knife, and whether it was immediately apparent from the blood appearing on Garcia's shirt that he had been struck in the back or shoulder by the first bullet
 
 
 [6]
 In the District Court, the appellants argued that the prejudice in Dr. Kesselman's testimony came from references in the "history" to the appellants' prior and present criminal records. The District Court correctly rejected this contention on the grounds that Dr. Kesselman's testimony was proper rebuttal to the appellants' case which contained extensive references to the appellants' past juvenile delinquency and anti-social behavior (Opinion of 3/14/67, p. 6)
 
 
 [7]
 In considering appellants' contentions we have reviewed thoroughly the trial transcript, extracting and placing side by side the appellants' signed statements of the details of the crime (S-20 and S-21, read to the jury), the appellants' testimony concerning this subject, and the testimony of Dr. Kesselman relating such details as told to him over two months after the crime. Dr. Kesselman's testimony added no factual data or sequence of events not already presented to the jury and fully developed earlier in the trial
 
 
 [8]
 See Chapman v. State of California, 386 U.S. 18, 24 (1967), where the court noted at 21-22, 87 S.Ct. 824, at 827, 17 L.Ed.2d 705:
 "We are urged by petitioners to hold that all federal constitutional errors, regardless of the facts and circumstances, must always be deemed harmful. * * * We decline to adopt any such rule. * * * We conclude that there may be some constitutional errors which in the setting of a particular case are so unimportant and insignificant that they may, consistent with the Federal Constitution, be deemed harmless, not requiring the automatic reversal of the conviction."
 See, also, Spencer v. State of Texas, 385 U.S. 554, 562-566, 87 S.Ct. 648, 17 L.Ed. 2d 606 (1967).
 
 
 [9]
 The appellants' objection that Dr. Kesselman's testimony was not proper rebuttal was correctly overruled. Dr. Kesselman did not testify during the State's case and was called in rebuttal after the appellants had offered the testimony of two doctors, a psychologist and a psychiatrist, who testified as to their conclusions drawn from the appellants' past anti-social behavior, family background, problems with the law, etc. The appellants' doctors testified as to the brothers' personality disorders and low emotional age, Martin's being two to three years. Dr. Kesselman was called on rebuttal to testify to more normal behavioral patterns of the appellants, including a mental age of 13 or 14 for Martin and 14 to 16 for Michael (as opposed to 7 to 9 years by Dr. Smith, and 8 years by Dr. Latimer)
 
 
 [10]
 The testimony of Dr. Greifinger, the police surgeon who examined the appellants immediately after they signed their confessions, is similarly devoid of any prejudice, regardless of the question of voluntariness. Dr. Greifinger's "history" contained three short, allegedly prejudicial sentences:
 "Martin Reynolds told me that on April 1st, 1962 he robbed a store on Bergen Street. A man grabbed a knife and tried to stab his brother who was with him on the robbery. Martin Reynolds then told me that he shot the man and the man died."
 This skeleton story does not differ from the written confession of Martin admitted into evidence without objection. Moreover, the trial court asked the jury to withdraw, heard arguments, on the inadmissibility of the doctor's "history," and then recalled the jury and instructed them carefully on voluntariness before allowing these three sentences of testimony. This argument, and the findings made by the trial judge that no pressure was used by the doctor, that the defendants' will was not overcome, and that the answers were given voluntarily, answered the objection that there was no foundation for Dr. Greifinger's testimony. It is also noted that the trial judge repeated again at this time that the statement of one appellant to the doctor was not admissible against the other appellant.
 
 
 [11]
 This opinion adopts the relevant portion of the previous State v. Reynolds, 41 N.J. 163, 195 A.2d 449, 460-462, 1 A.L.R. 3d 1438 (1963), cert. den. 377 U.S. 1000, 84 S.Ct. 1930, 1934, 12 L.Ed.2d 1050 (1963)
 
 
 [12]
 It is also noted that both opinions in the Andres case relied on a construction of the 1897 statutory language by a previous Federal Court decision [Smith v. United States, 47 F.2d 518 (9th Cir. 1931)]. See 333 U.S. at 749 and 764, 68 S.Ct. 880
 
 
 
 15
 GANEY, Circuit Judge (dissenting).
 
 
 16
 I dissent.
 
 
 17
 In the course of the trial of the instant case to determine solely whether the appellants should suffer life imprisonment or the death penalty, it is important to remember that the State called as a witness Dr. Samuel R. Kesselman, a licensed, practicing physician of the State of New Jersey, whose specialty is neuropsychiatry, as a rebuttal witness to contradict the testimony of Dr. Smith and Dr. Latimer, two of the defense psychiatrists who had testified concerning the defendants' mental and emotional behavior. This is shown by the record for after objection was made by defense counsel to Dr. Kesselman's testimony on the ground that it was not proper rebuttal, there ensued the following colloquy:
 
 
 18
 "MR. LORDI: Of course it is rebuttal. They put two psychiatrists on the witness stand."
 
 
 19
 It is plain, therefore, that Dr. Kesselman was called merely to rebut, as indicated, the testimony of the two psychiatrists the defense had called.
 
 
 20
 Dr. Kesselman, in giving his training and educational background, qualified eminently as an extremely competent neuropsychiatrist, having a long list of qualifications which covered some two to three pages of the record. He interviewed both appellants, Martin and Michael Reynolds, alone, in private sessions, unaided by counsel, for one and one-quarter hours, and drew from both appellants the story of the shooting and stabbing which resulted in the death of the proprietor of the shop, Garcia, which testimony covered some three pages of the record. While Dr. Kesselman's testimony covered most of the statements which the defendants had given to the police and on the witness stand, it was nevertheless supplemented in various aspects therein, as, for example, his statement, "He admits to deliberate intent to hold up the store described by his brother.", and then reciting all the lurid details of the occurrence, including testimony that the proprietor was told not to move; that it was a stick-up; the grabbing of the knife by the proprietor and his stabbing Michael; and Martin's pulling the trigger and shooting him, as well as every detail that happened prior to the appellants' entry into the store and their escape thereafter. Dr. Kesselman was not called in the capacity of a detective, nor was he called as an investigator in the case. He, as indicated above, called to rebut the testimony of appellants' two psychiatrists, is a very highly regarded neuropsychiatrist and was competent to testify in rebuttal to what two psychiatrists called on the part of the defense had given in testimony in chief. As indicated in the majority opinion, he was competent to testify, as he did, in quite some detail, to contradict the references to the appellants' juvenile delinquency and anti-social behavior, as to which no objection could be taken, as this was his proper role.
 
 
 21
 Much is made in the majority opinion of the value of the rebuttal testimony of Dr. Kesselman in that it contradicted the written statements of Michael and Martin to the police and the testimony of both of them on the witness stand with relation to the shots fired during the occurrence of the killing. However, the record discloses that Michael, in his written statement to the police, said that Martin fired two shots at Garcia and Martin, according to Dr. Kesselman's testimony, also testified that he fired two shots. Michael, according to Dr. Kesselman, told him that he had only heard one shot fired, although he did say that he was at the cash register and saw Martin point his gun at the proprietor, Garcia, and immediately ran out of the store and while he was on the street he heard a shot fired. This was no doubt the second shot fired and the fact that he did not relate the firing of the first shot in his story to Dr. Kesselman had very little value by way of contradiction. It is to be remembered that Dr. Kesselman's inquiry was not the searching examination of a suspect in trying to build up a case for the State, as here there was no question of the guilt of both defendants as they had pleaded guilty to the killing. This is further emphasized by Dr. Griefinger's brief testimony of the shooting, relating that Martin told him he shot a man without mentioning the number of shots fired nor any details by way of entrance or exit of the defendants. The only question was whether the defendants should suffer the death penalty or life imprisonment.
 
 
 22
 Again, much has been made in the majority opinion of the failure of either of the appellants to relate the fact that Martin had withdrawal symptoms at the time of the shooting which Michael had testified to, with respect to Martin, on the witness stand. However, near the close of his testimony, Dr. Kesselman stated, "My conclusion would be that even though, the fact that he [an addict] is suffering from withdrawal symptoms would indicate that he is not under the influence of drugs." Accordingly, it would seem that while much is made of appellants' omission to recite their withdrawal symptoms in relating their story to Dr. Kesselman, it was of little or no value in view of Dr. Kesselman's statement with respect thereto, as being under the influence of drugs.
 
 
 23
 These contradictions, if any, in the testimony of Dr. Kesselman, by way of rebuttal testimony, were, as I have indicated, minimal at most, for here was an eminent psychiatrist going beyond his field and giving testimony as to the facts of the killing which bore no relation whatever to the purpose for which he was called. Its only purpose could be through repetition and addition, to jar and inflame the minds of the jurors against appellants as its reiteration was cumulatively prejudicial in augmenting the design of the prosecution in demanding the death penalty and, coming as it did from one of high standing in his profession, effected a most serious impact on the minds of the jurors.
 
 
 24
 It was encumbent, in my judgment, on the trial judge to confine Dr. Kesselman's testimony to the purpose for which he was called and especially so here in so sensitive an area where individuals' lives hung in the balance.
 
 
 25
 Accordingly, I would reverse the judgment of the lower court and allow the writ to issue unless within thirty days a new trial is granted as to the appellants' degree of guilt.