Application of Michael REYNOLDS for a Writ of Habeas Corpus.

Application of Martin REYNOLDS for a Writ of Habeas Corpus.

Civ. 244–65, 255–65.

United States District Court
D. New Jersey.
March 14, 1967.

Richard M. Glassner, for Michael Reynolds.

Philip J. Mylod, for Martin Reynolds.

Brendan T. Byrne, Prosecutor for Essex County, by Martin G. Holleran, Asst. Prosecutor.

SHAW, District Judge.

Each of petitioners, Michael Reynolds and Martin Reynolds, seeks the issuance of a writ of habeas corpus pursuant to 28 U.S.C. § 2241(a) (c) (3) et seq. Petitioners were indicted by an Essex County Grand Jury on July 23, 1962 for the murder of Fred Garcia, the owner of a store located at 938 Bergen Street, Newark, New Jersey. Mr. Garcia died as a consequence of a bullet wound inflicted by Martin Reynolds on April 1, 1962 while he and his brother, Michael Reynolds, were robbing the store. Petitioners were prosecuted by indictment pursuant to the provisions of N.J.S.A. 2A:113–2 whereby a person engaged in the commission of a felony during which the death of another occurs is guilty of murder in the first degree. It is further provided by N.J.S.A. 2A:113–4 that "every person convicted of murder in the first degree, his aiders, abettors, counsellors and procurers, shall suffer death, unless, the jury shall by its verdict, *and as a part thereof*, upon, and after the consideration of all of the evidence, recommend life imprisonment, in which case this and no greater punishment shall be imposed." (Emphasis supplied)

A jury found each petitioner guilty of murder in the first degree without recommendation of life imprisonment. Thereupon each of petitioners was sentenced to death on November 10, 1962.

Petitioners appealed their conviction in the New Jersey Supreme Court where it was affirmed. State v. Reynolds, 41 N.J. 163, 195 A.2d 449, 1 A.L.R.3d 1438 (1963). Thereafter, certiorari was denied by the United States Supreme Court, 377 U.S. 1000, 84 S.Ct. 1930, 1934, 12 L.Ed.2d 1050 (1963) and re-

hearing denied 379 U.S. 873, 85 S.Ct. 23, 13 L.Ed.2d 81 (1964). Petition for post conviction relief and stay of execution was denied by the Essex County Court on November 13, 1964. The Supreme Court affirmed. State v. Reynolds, 43 N.J. 597, 206 A.2d 750 (1965). Petitioners have exhausted their State remedies and now seek relief in this Court.

Upon independent review of the entire record, the Court finds that all points in issue presented here as well as others were presented in the State Court proceedings and that the pertinent facts are accurately and succinctly stated in the State Court opinions. Hence, it would serve no useful purpose to reiterate the same at length in this proceeding. It might also be noted that due to the recent evolution of principles of constitutional law relating to criminal convictions, the final arguments *now* pertinent to the questions presented are set forth in supplemental briefs furnished after Johnson v. State of New Jersey, 384 U. S. 719, 86 S.Ct. 1772, 16 L.Ed.2d 882 (1966).

The following contentions merit discussion:

1. Inculpatory statements made while in police custody were involuntary.

2. Introduction into evidence of juvenile offenses committed by petitioner Martin Reynolds and anti-social history of Michael Reynolds was unduly prejudicial and deprived petitioners of a fair opportunity for a verdict of life imprisonment.

3. Inflammatory statements of the Prosecutor during his summation deprived petitioners of a fair trial on the issue of punishment.

4. The charge of the trial court was ambiguous and denied to each of petitioners assurance of a unanimous verdict both on the question of guilt and on the question of punishment.

5. The manner of polling the jury was such that it could not be reasonably determined what the true verdict of each member of the jury was.

The only issue of substance in the trial of petitioners was the degree of punishment to which each would be subjected. The alternates were capital punishment or life imprisonment. It was admitted that the fatal shot was fired by Martin Reynolds and that the crime of murder was committed while he and his brother, Michael, were engaged in the commission of the offense of robbery on the premises of the victim. Counsel for Martin Reynolds stated in his opening:

"Now, you notice I did not say that these defendants would be entitled to an aquittal at your hands. And that very statement is something that I have never said before. I have really delivered the life of the defendant Martin Reynolds, I have handed it up. We do not deny our guilt of an intent to commit a robbery. Martin Reynolds went into that store. Martin Reynolds squeezed the trigger that sent that bullet into the body of Frederick Garcia. But we do deny—and that's why we are here—that this was a wilful, felonious killing, cold, ruthless killing with malice aforethought. And so we are here to test solely the issues of penalty, of punishment. You ladies and gentlemen are the arbiters of the facts in this case. You are the judge of the facts, all of the facts in this case, including the ultimate fact of guilt or innocence, and the still more ultimate fact—if there can be any more ultimate fact—of the awful judgment. You are to determine whether, insofar as my client Martin Reynolds is concerned, whether it is going to be life or death. Now, I can't place it on the line any fairer or any squarer than I have."

Counsel for Michael Reynolds stated in his opening:

"The question of punishment is a question of the degree of our sin, the degree of evil, which is a slang way of saying the same thing. We admit that at sundown, Sunday, April 1, 1962, Michael Reynolds entered the

premises at 938 Bergen Street in concert with his brother Martin for the purpose of robbing that place. Martin went in first. Martin had a gun. Michael went in second. Michael did not have a gun. Michael knew that Martin had a gun, but Michael did not know that the gun would be used for any but the purpose of intimidation. Even if a shot were fired he did not contemplate that that would be done but for the purpose of intimidation."

Counsel for Michael Reynolds reiterated in summation that the only issue was the question of whether life imprisonment or death should be imposed:

"On April the 1st of this year an innocent man was invaded in his humble place of business, a man who worked two days for a day and seven days for five, lived in a few rooms in the back and earned his humble subsistence. This man was robbed. This man was murdered. And yet this is the end of the second week in which we are trying that case. Exactly what are we trying? Certainly, we are not trying to find out whether the defendants are guilty or innocent. We start with that. They are guilty. They wilfully, knowingly entered the premises for the purpose of robbing. A death has resulted during this adventure and it does not matter legally whether the death was intended, and I admit that his Honor will so charge you. It would not matter even if the death were accidental or even of a fellow-defendant—or rather a fellow robber."

With attention focused upon the narrow issue projected at trial the present contentions of petitioners will be reviewed.

Incriminating statements by petitioners consisted of confessions to the police and inculpatory statements made to Doctor Greifinger, a police surgeon, and to Doctor Kesselman, a psychiatrist retained by the State. As to the confessions made to the police, it was conceded at trial by counsel that they were voluntary and that there was no coercion, promise, threat or force employed to obtain them. The record discloses the following statements made by Mr. Glassner, counsel for Michael Reynolds and by Mr. Mylod, counsel for Martin Reynolds:

"MR. GLASSNER: I wish to state that the statement was voluntarily given.

MR. LORDI: I understand there is an admission.

MR. GLASSNER: Yes, sir.

MR. LORDI: This is with respect to the statement of Michael.

MR. GLASSNER: Yes, sir. It was voluntarily given."

\* \* \* \* \* \*

"Q. During all this time were any promises or offers of reward made to induce Michael or Martin Reynolds to sign each other's statements?

MR. MYLOD: We will concede on behalf of Martin that there were no threats, promises or force.

MR. LORDI: That is on behalf of Martin.

MR. GLASSNER: The same.

MR. LORDI: The same on behalf of Michael?

MR. GLASSNER: Michael."

 It is true that the requirements of Escobedo v. State of Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964) and Miranda v. State of Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) relating to in-custody interrogation were not observed, but counsel no longer contend in the light of Johnson v. State of New Jersey, supra, that these decisions are applicable in the trial of this case which was concluded during November 1962. It is, however, contended now that the circumstances surrounding the procurement of in-custody incriminating statements, particularly by the police psychiatrist, were such as would clearly indicate that the will of each of petitioners was overborne, citing Davis v. State of North Carolina, 384

U.S. 737, 86 S.Ct. 1761, 16 L.Ed.2d 895 (1966). There are no circumstances in the instant case by reason of which it could be considered analogous in point of fact to *Davis*. Indeed, there is no evidence of any nature whatsoever disclosed by the record from which any reasonable inference could be drawn that either of petitioners was subjected to the pressure of coercive circumstances, whereby they acted involuntarily in giving oral and written statements. And further, the record is replete with evidence of waiver of any alleged constitutional right which they may now assert to challenge the admissibility of their statements. Moreover, their present contention must be considered in the light of the defense which, as heretofore stated, presented the sole substantial issue of the degree of punishment. Guilt was not challenged. Accordingly, this Court has reached the conclusion that a hearing on the voluntary nature of any incriminating statements made is not warranted in this case. In fact, it is difficult to conceive what either of petitioners might be able to offer here in contradiction of the trial record to establish that any inculpatory statement made was not freely and voluntarily made. This is not a case where the reliability or integrity of the fact finding process is open to challenge. Form rather than substance is the matter placed in issue.

The next question relates to the testimony of Dr. Greifinger and Dr. Kesselman on behalf of the State. Dr. Greifinger added nothing in his testimony to the incriminating statements which petitioners made to the police which, as heretofore stated, were admittedly voluntary statements. Dr. Kesselman testified on behalf of the State in rebuttal. The objection to his testimony is that he introduced into evidence juvenile offenses committed by petitioner Martin Reynolds and the anti-social history of Michael Reynolds. There might be substance to the argument on this if the testimony of Dr. Kesselman had been of-fered on the State's case. But his testimony came after petitioners and their two doctors testified on defense and during the course of which juvenile delinquency and anti-social conduct was developed. It was strictly rebuttal testimony and this Court does not find that Dr. Kesselman enlarged substantially upon the overall pattern of juvenile offenses and anti-social history which had previously been introduced by petitioners. The only variance of substance was in the conclusions reached as to degree of responsibility going to the issue of mitigation of punishment.

Petitioner Martin Reynolds was 19 years of age at the time of the commission of the offense in question, and Michael was 23 years of age. Dr. Latimer related the history he had obtained from Martin Reynolds. It involved a record of delinquency since Martin was 12 years of age and included stealing for which he was sent to reform school and continued use of narcotics, progressing from the use of marihuana to heroin. He "just took whatever he wanted whenever he wanted it. About six months ago he suggested to his brother obtaining money by force because they both badly needed a fix." Though incidents in the history of Michael Reynolds varied from that of Martin Reynolds, Dr. Latimer, when asked how he would compare the two, stated, "Very closely. In fact in my report I mentioned that they were almost carbon copies." The history of juvenile delinquency was constant and persistent from an early age. Dr. Smith testified more or less to the same effect, further relating that each of petitioners knew the difference between right and wrong but could not explain why he acted as he did. Dr. Smith specifically stated that each petitioner knew what he was doing at the time of the commission of the crime charged. Extensive direct testimony of Martin brought out even more vividly his past record.

It was against this background that Dr. Kesselman's testimony

was introduced on behalf of the State in rebuttal. Hence, we do not have a situation here where the State on its own case brought into evidence matter that would ordinarily not be admissible because of its prejudicial effect upon petitioners. See State v. Mount, 30 N.J. 195, 152 A.2d 343 (1959). It was the strategy of the defense to bring to the attention of the jury delinquency evolving out of background environmental circumstances with the hope that such might be persuasive in inducing the jury to reach the conclusion that these petitioners should not be held to the same degree of responsibility as others involved in a like crime. Under the circumstances it was not improper for the State to introduce the expert testimony of its psychiatrist in rebuttal and to permit him to refer in his testimony to history furnished by petitioners upon which he grounded his conclusions as to the character of each. And even assuming for the purpose of argument that the testimony of Dr. Kesselman on behalf of the State was not strictly confined to rebuttal of defense testimony, there would still be no sound basis for the argument that there had been a denial of due process under the Fourteenth Amendment. See Spencer v. State of Texas, 385 U.S. 554, 87 S.Ct. 648, 17 L. Ed.2d 606 (1967); Rundle v. Johnson, 386 U.S. 14, 87 S.Ct. 847, 17 L.Ed.2d 695 (1967); and United States ex rel. Rucker v. Myers, 311 F.2d 311 (3rd Cir. 1962).

■ It may be said that the Prosecutor's remarks relating to the record of delinquency of each of petitioners was forceful and colorable of a very persuasive nature in directing the attention of the jurors to repeated manifestations of bad character, but it cannot be said that he exceeded the bounds of fair comment on the evidence. Viewed in the light most favorable to the argument of petitioners, it is the opinion of this Court that the comments of the Prosecutor were not of such nature that it could be said by virtue thereof that petitioners suffered a denial of due process.

■ Petitioners argue that the charge of the trial court was ambiguous in that it did not express clearly to the jury that its verdict must be the unanimous verdict of all of the jurors both as to guilt and punishment. This argument was presented to the New Jersey Supreme Court in State v. Reynolds, supra, and was rejected. This Court, upon reading the pertinent excerpts of the charge of the trial court reaches the same conclusion. The trial court charged:

"I shall now discuss with you, members of the jury, the matter of the substance and form of your verdicts, in the event that you find one or both of these defendants guilty of murder. First of all, *it is mandatory* that any verdict you may reach in respect to each of these defendants must represent a *completely unanimous agreement* by all twelve of the jurors who shall finally decide this case. There must be *complete accord among all twelve as to every element of any verdict returned.* I think it would be well for me to repeat at this time a provision of our statute that I earlier read to you. I quote:

'Every person convicted of murder in the first degree, his aiders, abettors, counsellors and procurers, shall suffer death, unless, the jury shall by its verdict, *and as a part thereof,* upon, and after the consideration of all of the evidence, recommend life imprisonment, in which case this and no greater punishment shall be imposed.'

"This, members of the jury, is a first-degree case. On the evidence presented to you either or both of these defendants are guilty of murder in the first degree, or he or they are not guilty. We are not here concerned with any other degree of murder. In the event that you should find either of these defendants guilty of murder in the first degree, you must keep in mind that your duty in regard to that defendant does not end there. It is your duty to determine

the character of the punishment that shall be imposed on that particular defendant. And in performing that duty you must have regard for and consider all of the evidence in the case, including the evidence relative to the background and the mental and emotional abilities and disabilities of each one of these defendants. You will recall that there has been a great deal of testimony and evidence bearing on these subjects, and matters of like kind in the course of this trial. And it is your function and your duty to evaluate all of them in reaching your conclusion on the matter of punishment.

"I believe it will be helpful if I summarize for you the various verdicts which may eventuate from your deliberations. You may find both defendants guilty of murder in the first degree, or you may find both of them not guilty. Or you may find one of the defendants guilty of murder in the first degree, and find the other defendant not guilty. And finally, in respect to a verdict of guilty of murder in the first degree, you may, *as part of such verdict*, recommend life imprisonment."

\* \* \* \* \* \*

"The right to qualify a verdict of guilty by including therein a recommendation of life imprisonment is conferred upon the jury alone. In all cases of murder in the first degree the statute which I have read to you commits the whole matter of the exercise of this right to the *judgment and conscience of this jury* upon and after a consideration of all the evidence. The authority of the jury to decide that the accused shall not be punished capitally extends to every case of murder in the first degree in which upon a view of the whole evidence *the jury* is of the opinion that it would not be just or wise to impose capital punishment." (Emphasis supplied)

It is inconceivable in the light of this charge where the issue was a matter of life or death that the jury in its general verdict would have ignored a dissent as to capital punishment by one or more of its number. The fact that there must have been debate on the issue of a recommendation is evidenced by a question of the jury during the course of its deliberations by which they requested a further instruction from the trial judge as to whether the jury could recommend life imprisonment in the one case and not in the other.

This Court does not find any ambiguity in the trial court's charge which would lead a jury to believe that it was not necessary to be unanimous in its verdict both on a finding of guilt and on a finding that life imprisonment should not be recommended. To assume otherwise in a case involving capital punishment would be tantamount to a finding, not only of a very low degree of intelligence on the part of the jurors, but also a callous lack of regard for their responsibility. It was clearly stated in the charge that, "There must be complete accord among all twelve as to every element of any verdict returned." And it was made clear by the further portions of the court's charge that a recommendation as to life imprisonment or the absence of it was one of the elements of the verdict. Moreover, had there been any disagreement among the jurors on the matter of recommendation, it is highly unlikely that the same would not have come to light when each juror was polled. The jurors had been clearly and unequivocally instructed that in the absence of a recommendation, the penalty was death.

■■ In conjunction with the contention that the charge of the trial court was ambiguous on the matter of penalty, it is also urged that the manner of polling the jury was such that it could not be reasonably determined what the true verdict of each member of the jury was. First, it must be observed that this did not occur to counsel at the conclusion of the court's poll. Neither did the presently alleged ambiguity in the charge.

No exceptions were taken. It is recognized, however, that if in a case of this kind, error of federal constitutional dimension has been committed, the Court would be obligated to recognize such error despite the fact that remedial action by the trial judge was not sought either by way of exception to the charge or by a special request in the matter of polling the jury. The poll here was conducted in accordance with the established practice and the responses of the jury indicated unanimity in the verdict.

The Court has considered all of the arguments raised in the respective petitions and by the initial and supplementary briefs filed on behalf of petitioners and has, as indicated at the outset, concluded that the only questions which merit discussion are those presented in the final supplementary briefs filed after Johnson v. State of New Jersey, supra. It is the opinion of the Court that neither of the petitioners has been deprived of any federally secured constitutional right which would justify the issuance of a writ of habeas corpus.

One final observation should be made. Assigned counsel, Richard M. Glassner, Esq. and Philip J. Mylod, Esq., are to be commended for the loyal faithful and competent representation afforded to these petitioners. Counsel raised, as they had an obligation to do, every conceivable issue which could be argued in favor of the issuance of the writs of habeas corpus sought by petitioners and it is apparent from a review of the entire record of the State court proceedings that what has occurred here is a continuance of the competent representation reflected in the proceedings in the State courts. Each of counsel has conducted himself in accordance with the best traditions of the Bar in the representation of these indigent petitioners and is deserving of commendation.

Now, therefore, it is on this 14th day of March, 1967 ordered that the application of each of petitioners herein for a writ of habeas corpus be and the same hereby is denied.